**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 10, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

GORDON ROBERTSON,

      Plaintiff - Appellant,

      v.

LAS ANIMAS COUNTY SHERIFF'S
DEPARTMENT; LAS ANIMAS
COUNTY SHERIFF JAMES CASIAS;
KURT EMERY; KADE BASSETT; and
BOARD OF COUNTY
COMMISSIONERS OF LAS ANIMAS
COUNTY, COLORADO,

      Defendants - Appellees.

No. 06-1027

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D. Ct. No. 04-CV-2294-EWN-OES)**

---

Virginia Hudson Louden, Trinidad, Colorado, and Marc P. Charmatz, Senior Attorney,
National Association of the Deaf Law Center, Silver Spring, Maryland, appearing for
Plaintiff-Appellant.

Andrew D. Ringel, Esq. (Awilda R. Marquez, Esq., with him on the brief), Hall & Evans,
L.L.C., Denver, Colorado, appearing for Defendants-Appellees.

---

Before **TACHA**, Chief Circuit Judge, **McWILLIAMS**, and **LUCERO**, Circuit Judges.

---

**TACHA**, Chief Circuit Judge.

Plaintiff-Appellant Gordon Robertson appeals the District Court's entry of summary judgment on his claims brought under 42 U.S.C. § 1983 and the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 et seq., in connection with his arrest and detention for alleged violations of a temporary civil protection order. We have jurisdiction under 28 U.S.C. § 1291 and AFFIRM in part, REVERSE in part, and REMAND for proceedings consistent with this opinion.

## I. BACKGROUND

A.    Mr. Robertson's Arrest

Mr. Robertson owns a house and nine acres of property in Las Animas County, Colorado. The Murnanes, Mr. Robertson's neighbors, live in a mobile home approximately three-hundred yards north of Mr. Robertson's house. In 2003, Mrs. Terri Murnane made several calls to 911 to report that someone (whom she believed to be Mr. Robertson) was trespassing on her property and peering through the windows of her home. In response to these complaints, Deputy Kade Bassett and Deputy Kurt Emery of the Las Animas County Sheriff's Department began patrolling the area and conducting surveillance on Mr. Robertson's house. During their investigation, they never observed Mr. Robertson cross onto the Murnanes' property.

On October 16, 2003, Mrs. Murnane obtained a temporary civil protection order ("TCPO") against Mr. Robertson requiring him to stay at least one-hundred yards away from the Murnanes. On November 4, 2003, Mrs. Murnane went to the sheriff's office to

report that she and her daughter, Samantha, had observed Mr. Robertson on their property earlier that evening in violation of the TCPO. According to Deputy Emery, Samantha told him that she and her brother were playing in her bedroom when she saw Mr. Robertson looking through her window, and Mrs. Murnane told him that she then saw Mr. Robertson running from their property toward his own residence. Deputy Emery reported in an affidavit that he found both Mrs. Murnane and Samantha to be credible based on his observations of their behavior and his prior experiences with them when investigating previous complaints. Based on the Murnanes' statements, Deputy Emery believed he had probable cause to arrest Mr. Robertson for violating the TCPO. He arrested Mr. Robertson without a warrant that day.

After arresting Mr. Robertson, Deputy Emery prepared a "Warrantless Arrest Affidavit" setting forth the basis for probable cause. In the affidavit, Deputy Emery described the statements he received from both Mrs. Murnane and Samantha. He also incorporated into the affidavit portions of an affidavit Deputy Bassett had drafted in October. Deputy Bassett's affidavit described that, on September 25, while investigating a complaint by Mrs. Murnane involving Mr. Robertson, he observed Mr. Robertson exit his house and walk toward the Murnanes' property until he was deterred by an oncoming car. In October, Deputy Bassett sought an arrest warrant for Mr. Robertson based on this affidavit, but the judge denied the request after concluding that the affidavit did not establish probable cause. Deputy Bassett did not know that Deputy Emery used his earlier affidavit to support a finding of probable cause related to Mr. Robertson's

-3-

November 4 arrest. Deputy Emery explained that he included portions of Deputy Bassett's affidavit in his subsequent affidavit because he wanted the judge who presided over the probable cause hearing to understand the historical background of the Murnanes' complaints.

Following his arrest on November 4, Mr. Robertson spent the night in a detention facility.[1] The following day, the judge dismissed the case for lack of probable cause on the basis that the affidavit supporting the arrest contained substantial portions of Deputy Bassett's affidavit, which the judge had already determined failed to show probable cause in an earlier proceeding.

## B.    Mr. Robertson's Incarceration

Mr. Robertson is deaf. His adult-onset hearing loss was gradual, beginning in 1965 and continuing until 1988, when the Veterans Administration determined he is one-hundred-percent disabled. Although he now has a cochlear implant[2] that permits him to hear human voices when the person speaking is facing him and standing only two-to-three feet away, he cannot hear voices emanating from a mechanical device (such as a radio or a television), and he cannot hear the voice of anyone who is not facing him and

---

[1] The events that occurred at the detention facility, which we discuss *infra*, form the basis of Mr. Robertson's ADA claim.

[2] A cochlear implant is a pair of components that treat severe deafness. "An outer component, placed behind the ear, receives sound and converts it into electric signals. It wirelessly transmits the signals to a surgically implanted inner component, which in turn stimulates the nerve endings of the cochlea. The nervous system transmits the impulses to the brain, which interprets them as sound." *Carolina Care Plan Inc. v. McKenzie*, 467 F.3d 383, 385 (4th Cir. 2006).

who is not standing within a few feet of him. Because his hearing loss began later in his life, he has no trouble speaking.

When Deputy Emery first arrested Mr. Robertson at his house on November 4, Mr. Robertson asked to call his attorney. Rather than using a traditional telephone, Mr. Robertson initiated a call to his attorney (with the help of his niece) through a relay device installed on his home computer. Deputy Emery then escorted Mr. Robertson to the detention facility, where Deputy Emery told the booking officer that Mr. Robertson "has difficulty hearing." During the booking process, when the booking officer asked Mr. Robertson if he had any physical or health problems, Mr. Robertson responded that he did not. Mr. Robertson does not recall telling anyone at the detention facility that he is deaf, but he stated in an affidavit that the officers there "simply acted as if they knew I was deaf." He completed the booking process without any form of hearing assistance. The officers then inventoried hearing-aid batteries that Mr. Robertson was carrying in his pocket.

After completing the booking process, a detention officer placed Mr. Robertson in a "pod," a large jail cell containing several individual cells. The next morning, Mr. Robertson wished to contact his attorney. The pod contained a telephone, which other inmates could use to place outgoing calls anytime between the hours of 6:30 a.m. and 11:00 p.m. The phone was of no use to Mr. Robertson, however, because it was not equipped with a teletypewriter ("TTY") or a telecommunication device for the deaf ("TDD"). A sign affixed to the wall of his cell advised that, if an inmate wanted to

contact someone, he or she should leave a note in a slot in the cell. Because the cell did not contain paper or a writing implement Mr. Robertson borrowed some paper and a pencil from another inmate. He wrote a message stating that he wanted to talk with his attorney and left it in the slot. The note did not indicate that he could not use the phone, nor did it contain a request for a TTY or a TDD. No one responded to his note. The cell also contained an intercom system, which permitted an inmate to contact a detention officer in "Master Control." Mr. Robertson did not attempt to contact anyone through the intercom system, explaining that "[i]f a detention officer spoke back, I wouldn't have heard him, and that detention officer would[,] more likely than not, have ignored the call the same way my note went ignored."

Several hours after Mr. Robertson left the note in the slot, a detention officer escorted him from his cell to a room in the detention facility where he was to observe and participate in his probable cause hearing by closed-circuit television. The officer did not tell Mr. Robertson where they were going and Mr. Robertson did not ask. Though Mr. Robertson had not spoken with his attorney that day, his attorney was present in the courtroom during the probable cause hearing. Because Mr. Robertson cannot hear voices projected through mechanical devices, he did not know that he was attending his probable cause hearing, and he could not hear what the judge and his attorney were saying. He told the detention officer that he could not hear what was going on, but she did nothing about it. Other inmates, who were also present in the room for their probable cause hearings, were able to hear the judge and respond to questions posed to them. Mr.

-6-

Robertson does not know whether the judge asked him any questions. Following the

hearing, the court entered an order dismissing the case against Mr. Robertson for lack of

probable cause. No one at the facility told him that his case was dismissed. He learned of

this disposition from his attorney later that day when he was released from custody.

C.    Procedural History

On November 4, 2004, Mr. Robertson filed a complaint under 42 U.S.C. § 1983

against Deputy Emery, Deputy Bassett, Sheriff James Casias, and Mrs. Murnane.[3] Mr.

Robertson alleged that the defendants contributed to his wrongful arrest on November 4,

2003, in violation of his Fourth and Fourteenth Amendment rights.[4] He also claimed that

the Las Animas County Sheriff's Department and Sheriff Casias violated Title II of the

ADA by not providing him with telephone services while he was imprisoned and by not

allowing him to participate in his probable cause hearing. For both his § 1983 claim and

his ADA claim, he sought compensatory and punitive damages, as well as attorneys' fees

and costs. He also sought declaratory relief for the ADA claim.

The defendants filed a motion for summary judgment on all claims. The District

---

[3]The District Court dismissed the complaint as it applied to Mrs. Murnane; Mr. Robertson does not appeal that ruling.

[4]Mr. Robertson's complaint did not initially plead a Fourth Amendment violation, but instead alleged only a violation of the Fourteenth Amendment and the Colorado Constitution. After the defendants pointed out this error in their summary judgment motion, Mr. Robertson requested that the District Court read his complaint to allege a Fourth Amendment violation. The court allowed Mr. Robertson to amend his complaint "in effect" to reflect the Fourth Amendment claim. The District Court concluded that Mr. Robertson did not state a violation of the Colorado Constitution, and Mr. Robertson does not appeal that ruling.

Court granted the motion, concluding that: (1) Deputies Bassett and Emery and Sheriff Casias are entitled to qualified immunity on the § 1983 claim; (2) Mr. Robertson failed to establish that the defendants violated his Fourteenth Amendment rights; and (3) Mr. Robertson is not a "qualified individual with a disability" within the meaning of the ADA, and, even if he were, he did not establish that he was denied the benefits of a public entity's services, programs, or activities. Mr. Robertson does not contest the District Court's ruling that Sheriff Casias is entitled to qualified immunity on the § 1983 claim or its ruling on the Fourteenth Amendment claim; with respect to the remainder of the District Court's rulings, Mr. Robertson timely appeals.[5]

## II. DISCUSSION

We review a district court's grant of summary judgment de novo, applying the same legal standard as the district court. *Deschenie v. Bd. of Educ. of Cent. Consol. Sch. Dist. No. 22*, 473 F.3d 1271, 1276 (10th Cir. 2007). That is, summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions

---

[5]Mr. Robertson has raised several issues in his opening brief to this Court that we will not address on appeal. Mr. Robertson alleges in his opening brief that Deputy Emery and Deputy Bassett were not properly trained, were "improperly caught up emotionally in the case," and criminally trespassed on his property. He does not suggest how these allegations implicate any of his constitutional rights, nor does he provide any legal authority to support such contentions. We therefore decline to address these allegations on appeal. *See Merida Delgado v. Gonzales*, 428 F.3d 916, 921 (10th Cir. 2005) (declining to address a constitutional claim when plaintiff cited no supportive legal authority); *Rios v. Ziglar*, 398 F.3d 1201, 1206 n.3 (10th Cir. 2005) ("To make a sufficient argument on appeal, a party must advance a reasoned argument concerning each ground of the appeal, and it must support its argument with legal authority." (internal citation omitted)).

on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). We view all evidence and draw all reasonable inferences from that evidence in favor of the nonmoving party. *Deschenie*, 473 F.3d at 1276.

A.     Section 1983

Section 1983 provides that "[e]very person" who acts under color of state law to deprive another of constitutional rights "shall be liable to the party injured in an action at law." 42 U.S.C. § 1983. But "[t]he doctrine of qualified immunity shields government officials performing discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Moya v. Schollenbarger*, 465 F.3d 444, 455 (10th Cir. 2006) (internal quotation marks and alteration omitted).

When the defendant asserts qualified immunity as a basis for summary judgment, we must first ascertain whether the plaintiff has sufficiently asserted the violation of a constitutional right. *Arrendondo v. Locklear*, 462 F.3d 1292, 1297 (10th Cir. 2006). If the plaintiff meets this burden, we then consider whether the law was clearly established at the time of the defendant's actions. *Id.* In order for the law to be considered clearly established, "there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Albright v. Rodriguez*, 51 F.3d 1531, 1535 (10th Cir. 1995) (quotation omitted). If either of these requirements is not met, the defendant is entitled to

qualified immunity and summary judgment is appropriate.

When a warrantless arrest is the subject of a § 1983 action, the arresting officer is entitled to qualified immunity if a reasonable officer could have believed that probable cause existed to make the arrest. *Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir. 1995). "Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense." *Id.* (quotation omitted). But "[e]ven law enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to immunity." *Id.* (quotation omitted).

Deputy Emery stated in his affidavit that he interviewed both Mrs. Murnane and Samantha. Samantha indicated to him that, while she was in her bedroom, she saw Mr. Robertson standing outside, peering in through her window. Mrs. Murnane said that she then saw Mr. Robertson running from her property back toward his own residence. Based upon these statements, which Deputy Emery found credible, Deputy Emery believed he had probable cause to arrest Mr. Robertson for violating the TCPO. Indeed, this was enough to create probable cause. *See United States v. Jenkins*, 313 F.3d 549, 554 (10th Cir. 2002) (explaining informant's tip is reliable and may form basis for probable cause when informant's identity is known to police and informant witnesses alleged wrongdoing firsthand); *see also United States v. Johnson*, 364 F.3d 1185, 1191 (10th Cir. 2004) (same). Mr. Robertson has the burden of showing that these statements did not

constitute reasonably trustworthy information sufficient to lead a prudent officer to believe that Mr. Robertson violated the TCPO. *See Romero*, 45 F.3d at 1476 & n.1 (noting that, in a § 1983 case, the plaintiff bears the burden to show that the officer did not rely on reasonably trustworthy information).

Mr. Robertson suggests that the information was not reasonably reliable because Deputies Emery and Bassett fabricated information included in the affidavit on which Deputy Emery based his probable cause determination. *See Taylor v. Meacham*, 82 F.3d 1556, 1562 (10th Cir. 1996) ("It is a violation of the Fourth Amendment for an arrest warrant affiant to 'knowingly, or with reckless disregard for the truth,' include false statements in the affidavit."). To support his assertion that the deputies falsified information, Mr. Robertson relies on two pieces of evidence. First, Mr. Robertson points to the fact that Deputy Bassett's logbook for September 25, a day on which he conducted surveillance of Mr. Robertson, indicates that Deputy Bassett observed Mr. Robertson outside his own residence, but that Mr. Robertson "did not approach the [Murnanes'] residence." Deputy Bassett's subsequent affidavit, however, reports that, on September 25, he observed Mr. Robertson "exit his residence and begin to walk across his property toward Mrs. Murnane's residence" until Mr. Robertson was apparently deterred by a passing vehicle. The contradiction between Deputy Bassett's statements in the logbook and his subsequent affidavit, Mr. Robertson argues, indicates that Deputy Bassett fabricated the information in his affidavit. But even if this were true, Deputy Emery arrested Mr. Robertson based on his own separate affidavit. Although Deputy Emery's

-11-

affidavit repeated portions of Deputy Bassett's affidavit, Deputy Emery's affidavit contained independently sufficient information on which to base the probable cause determination—the statements of Mrs. Murnane and Samantha. *See id.* at 1562 ("If an arrest warrant affidavit contains false statements, the existence of probable cause is determined by setting aside the false information and reviewing the remaining contents of the affidavit." (quotation omitted)).

The second piece of evidence Mr. Robertson points to is the fact that approximately one week after his arrest, on November 13, Samantha appeared at a hearing seeking a permanent civil protection order against Mr. Robertson and testified that, on the night in question, she saw Mr. Robertson on their property while she was in the car, not in her bedroom, as Deputy Emery indicated in his affidavit. But even if we assume that Samantha's later testimony is inconsistent with Deputy Emery's affidavit, this fact alone does not show that Deputy Emery fabricated information. *See United States v. Knapp*, 1 F.3d 1026, 1029 (10th Cir. 1993) ("It is not enough to show that the informant lied to an unsuspecting affiant, or that an affiant's negligence or innocent mistake resulted in false statements in the affidavit. . . . [A]s long as the affidavit reflected what [the officer] believed to be true, the warrant was properly issued." (citation and quotation omitted)); *Taylor*, 82 F.3d at 1563–64 (holding defendant police officer is entitled to qualified immunity when plaintiff presented no evidence that false statements in affidavit were made knowingly or with reckless disregard for the truth). Nor does it show that Samantha's earlier statement that she saw Mr. Robertson while in her bedroom

was not reasonably reliable at that time. *See Romero*, 45 F.3d at 1477 (evaluating probable cause based on information the officer reasonably relied on "at the time of the arrest").

Mr. Robertson appears to argue that Deputy Emery's "history" as a "dishonest, perjurer, and trespasser[]" makes it likely that he "could have and did tell Samantha what to say on November 4." Even if Mr. Robertson had proffered facts to establish such a "history" and its connection to Samantha's statement, the affidavit would still provide a sufficient basis on which to conclude that Mr. Robertson violated the TCPO because it contains Mrs. Murnane's uncontradicted statement that she observed Mr. Robertson running from her property back toward his own residence. *See Taylor*, 82 F.3d at 1562. Deputy Emery could reasonably believe that probable cause existed based on this statement. Accordingly, Mr. Robertson has failed to establish a genuine dispute as to whether Deputy Emery violated his Fourth Amendment rights, and Deputy Emery is therefore entitled to qualified immunity on this claim.

Finally, although his brief is not entirely clear on this point, Mr. Robertson also appears to contend that Deputy Bassett violated his Fourth Amendment rights by contributing to his arrest on November 4. Mr. Robertson suggests that Deputy Bassett contributed to an unlawful arrest because Deputy Emery, without Deputy Bassett's knowledge, included in his "Warrantless Arrest Affidavit" language from Deputy Bassett's earlier affidavit regarding events occurring on September 25. But as explained above, probable cause that Mr. Robertson violated the TCPO on November 4 existed

-13-

even without Deputy Bassett's allegedly false statements. *See Taylor*, 82 F.3d at 1562. Furthermore, Deputy Bassett played no role in Mr. Robertson's arrest that day. It is axiomatic that, to prevail on a damages claim for a constitutional violation pursuant to § 1983, the plaintiff must show that the defendant, acting under color of state law, "personally participated in the alleged violation." *Jenkins v. Wood*, 81 F.3d 988, 994 (10th Cir. 1996). Conclusory allegations are not sufficient to state a constitutional violation. *Id.* In sum, because Mr. Robertson has failed to assert the violation of a constitutional right, Deputies Emery and Bassett are entitled to qualified immunity.

B. ADA

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. This provision extends to discrimination against inmates detained in a county jail. *See Penn. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998) (holding that "[s]tate prisons fall squarely within the statutory definition of 'public entity,' which includes 'any department, agency, special purpose district, or other instrumentality of a State or States or local government'" (quoting 42 U.S.C. § 12131(1)(B))). To state a claim under Title II, the plaintiff must allege that (1) he is a qualified individual with a disability, (2) who was excluded from participation in or denied the benefits of a public entity's services, programs, or activities, and (3) such exclusion, denial of benefits, or discrimination was by reason of a disability. *See* 42

-14-

U.S.C. § 12132; *Kiman v. N.H. Dep't of Corr.*, 451 F.3d 274, 283 (1st Cir. 2006). The District Court held that Mr. Robertson is not disabled within the meaning of the ADA and that, in any event, he was not denied the benefits of the detention facility's services by reason of his disability because he failed to request an accommodation.[6]

*1.      A qualified individual with a disability*

A disability within the meaning of the ADA is, *inter alia*, "a physical or mental impairment that substantially limits one or more of the major life activities" of an individual. 42 U.S.C. § 12102(2)(A). Individuals attempting to prove disability status under this test may not merely rely on evidence of a medical diagnosis of an impairment. "Instead, the ADA requires those 'claiming the Act's protection . . . to prove a disability by offering evidence that the extent of the limitation [caused by their impairment] in terms of their own experience . . . is substantial.'" *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 198 (2002) (quoting *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 567 (1999)).

It is uncontested that Mr. Robertson has a hearing impairment. It is also uncontested that "hearing" is a major life activity. *See Williams*, 534 U.S. at 197 (noting that the term "major life activities," as used in the ADA, "refers to those activities that are of central importance to daily life" and includes "such basic abilities as walking, seeing, and hearing"); *see also* 28 C.F.R. § 35.104 ("The phrase major life activities means

---

[6]Although the defendants do not argue the point, we note that both use of the telephone and participation in a probable cause hearing are "services" under the ADA.

functions such as . . . hearing . . . .").  Thus, whether Mr. Robertson is disabled depends

only on whether his impairment "substantially limits" his ability to hear.

Mr. Robertson testified that his inability to hear does not physically bother him and

that he does not consider it either a physical or a mental impairment—he considers it a

communication problem.  Based on this testimony, the District Court held: "by Plaintiff's

own admission, Plaintiff's hearing impairment is not 'substantial' within the meaning of

the ADA."  But the fact that Mr. Robertson is not bothered by his impairment or that he

does not consider himself to be substantially limited by it does not enter into the calculus.

*See Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 22 (1st Cir. 2002) ("The focus is

not on whether the individual has the courage to participate in the major life activity

despite her impairment, but, rather, on whether she faces significant obstacles when she

does so.").  Whether a person is "substantially limit[ed]" must be determined by whether

the individual is "[u]nable to perform a major life activity that *the average person in the*

*general population can perform*," or is "[s]ignificantly restricted as to the condition,

manner or duration under which an individual can perform a particular major life activity

as compared to the condition, manner, or duration under which *the average person in the*

*general population* can perform that same major life activity."  *Doebele v. Sprint/United*

*Mgmt. Co.*, 342 F.3d 1117, 1130 (10th Cir. 2003) (quoting 29 C.F.R. § 1630.2(j)(i))

(emphasis added).  Even taking into account the mitigating effects of the cochlear implant

on his inability to hear, *see Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 482 (1999)

(requiring court to take into account measures taken to mitigate an impairment when

determining whether person is substantially limited in major life activity), there is more than sufficient evidence for a reasonable jury to conclude that Mr. Robertson is substantially limited in his ability to hear as compared to the average person: Mr. Robertson can only hear human voices from those facing him and standing within two-to-three feet; he cannot hear sounds transmitted through electronic devices, such as a radio or television; and he cannot hear sounds originating from beyond a few feet. Accordingly, summary judgment on this issue is not warranted.

Furthermore, there is also sufficient evidence for a reasonable jury to conclude that Mr. Robertson, as a detainee at the detention facility, was "qualified" to receive the benefits and services of the public entity. *See* 42 U.S.C. § 12131(2) (defining a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity"); *Yeskey*, 524 U.S. at 210–12 (holding disabled prisoners are "qualified" to receive the benefits and services of state prisons if they meet eligibility requirements, despite the fact that prisoners may not always participate voluntarily in services or programs). The defendants do not contend that an inmate must meet particular eligibility requirements in order to use the phone or to participate in his own probable cause hearing. Indeed, the services appear to be available to all inmates. Thus, the District Court erred in concluding, as a matter of law, that Mr.

Robertson was not a qualified individual with a disability within the meaning of the ADA.

*2. Discrimination by reason of disability*

The ADA requires more than physical access to public entities: it requires public entities to provide "*meaningful* access" to their programs and services. *Chaffin v. Kansas State Fair Bd.*, 348 F.3d 850, 857 (10th Cir. 2003); *see also Randolph v. Rodgers*, 170 F.3d 850, 858 (8th Cir. 1999) (holding that although deaf inmate could physically attend prison activities, he did not have "meaningful access" without a sign language interpreter). The Department of Justice ("DOJ") promulgated regulations to implement the nondiscrimination mandate of Title II. *See* 42 U.S.C. § 12134(a) (requiring the Attorney General to promulgate regulations to implement Title II).[7] To effectuate Title II's mandate, the regulations require public entities to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7).[8] The regulations also provide:

---

[7]The DOJ's regulations interpreting Title II are entitled to substantial deference. *Marcus v. Kan. Dept. of Revenue*, 170 F.3d 1305, 1307 n.1 (10th Cir. 1999).

[8]Title II's use of the term "reasonable modifications" is essentially equivalent to Title I's use of the term "reasonable accommodation." *See McGary v. City of Portland*, 386 F.3d 1259, 1266 n.3 (9th Cir. 2004) ("Although Title II of the ADA uses the term 'reasonable modification,' rather than 'reasonable accommodation,' these terms create identical standards."). In Title II cases, this Court has used the terms interchangeably, referring to an individual's request for a "modification" under Title II as a request for "accommodation." *See, e.g.*, *Tyler v. City of Manhattan*, 118 F.3d 1400, 1407 (10th Cir. 1997).

(a) A public entity shall take appropriate steps to ensure that communications with applicants, participants, and members of the public with disabilities are as effective as communications with others.

(b)    (1) A public entity shall furnish appropriate auxiliary aids and services[9] where necessary to afford an individual with a disability an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity conducted by a public entity.

(2) In determining what type of auxiliary aid and service is necessary, a public entity shall give primary consideration to the requests of the individual with disabilities.

28 C.F.R. § 35.160. The only limitation on these duties is that a public entity is not required "to take any action that it can demonstrate would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens." 28 C.F.R. § 35.164.

Mr. Robertson contends that the detention facility was required to provide him with auxiliary aids and services necessary to enable him to participate in and enjoy the benefits of the detention facility's services. He claims that the facility failed to fulfill this obligation because (1) he was not able to use a telephone to call his attorney while he was in his cell, and (2) he could not participate in the televised probable cause hearing. The defendants argue, and the District Court agreed, that they cannot be held liable under the ADA because they did not know Mr. Robertson was deaf and because he failed to request

_____

[9]The ADA defines "auxiliary aids and services" to include "qualified interpreters or other effective methods of making aurally delivered materials available to individuals with hearing impairments," *see* 42 U.S.C. § 12102(1)(A), and the DOJ expands upon this definition by noting that auxiliary aids and services may include, among other things, "qualified interpreters," "open and closed captioning," and "TDD's," 28 C.F.R. § 35.104(1).

an accommodation of any kind, let alone a TTY, TDD, or someone to interpret the court proceedings. Before a public entity can be required under the ADA to provide a disabled individual an auxiliary aid or service, a public entity must have knowledge of the individual's disability and the individual's need for an accommodation. In this case, there is a question of fact as to the detention facility's knowledge of each. Consequently, the District Court erred in granting summary judgment for the defendants.

a. Knowledge of Mr. Robertson's Disability

A public entity cannot know that a modification to its services under the ADA is necessary if it does not first understand that an individual requires such modification *because* he is disabled. In the context of Title I ADA claims, we have explained that, when an individual's disability is not obvious, the individual must inform its employer of the disability before the employer can be held liable under the ADA for failing to provide a reasonable accommodation. *See, e.g.*, *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1171–72 (10th Cir. 1999) (en banc). This is a "duty dictated by common sense lest a disabled [individual] keep his disability a secret and sue later for failure to accommodate." *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1134 (7th Cir. 1996). This duty is no less applicable in the context of Title II claims. Thus, before a public entity can be required under the ADA to provide an auxiliary aid necessary to afford an individual an equal opportunity to participate in the entity's services, programs, or activities, the entity must have knowledge that the individual is disabled, either because that disability is obvious or because the individual (or someone else) has informed the

entity of the disability.

Taking the facts in the light most favorable to Mr. Robertson, there is a genuine issue of fact regarding whether the defendants knew of Mr. Robertson's disability. The record reveals that Deputy Emery knew that Mr. Robertson had "difficulty hearing" and that he reported the same to the booking officer when he delivered Mr. Robertson to the detention facility. Although Mr. Robertson was able to answer all the questions posed to him during the booking process and he never asked for hearing assistance, he testified that he did not recall being asked if he was deaf because "[t]he detention officers simply acted as if they knew I was deaf." Furthermore, when the officers booked Mr. Robertson, they inventoried hearing aid batteries. These facts create a genuine issue of fact with respect to whether the defendants knew Mr. Robertson was deaf.

b. Knowledge of Mr. Robertson's Need for an Accommodation

Once a public entity has knowledge of an individual's disability, the entity must also have knowledge that an individual requires an accommodation of some kind to participate in or receive the benefits of its services. In other words, the entity must have knowledge that an individual's disability limits her ability to participate in or receive the benefits of its services. *See Taylor v. Principal Financial Group, Inc.*, 93 F.3d 155, 164 (5th Cir. 1996) (noting the "ADA requires employers to reasonably accommodate limitations, not disabilities"). This knowledge may derive from an individual's request for an accommodation. In certain instances, however, this knowledge will follow from the entity's knowledge of the individual's disability and his need for, or attempt to

-21-

participate in or receive the benefits of, a certain service. That is, the entity will know of the individual's need for an accommodation because it is "obvious." *See, e.g.*, *Kiman*, 451 F.3d at 283 (noting, in a Title II case that, "the ADA's reasonable accommodation requirement usually does not apply unless triggered by a request," but "sometimes the person's [disability and concomitant] need for an accommodation will be obvious; and in such cases, different rules may apply" (alteration, quotation, and citation omitted)); *Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 261 n.7 (1st Cir. 2001) (noting, in a Title I case, that a request for an accommodation may not be required when the disabled individual's needs are "obvious"); *Duvall v. County of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001) ("When the plaintiff has alerted the public entity to his need for accommodation (or *where the need for accommodation is obvious*, or required by statute or regulation), the public entity is on notice that an accommodation is required . . . ." (emphasis added)). When a disabled individual's need for an accommodation is obvious, the individual's failure to expressly "request" one is not fatal to the ADA claim. *See, e.g.*, *Chisolm v. McManimon*, 275 F.3d 315, 330 (3d Cir. 2001) (reversing district court's holding that a request for an accommodation was necessary when the public entity "had knowledge of [plaintiff's] hearing disability but failed to discuss related issues with him").[10]

---

[10]Whether the public entity's knowledge derives from an individual's request for an accommodation or an individual's obvious need for an accommodation, the critical component of the entity's knowledge is that it is aware not just that the individual is disabled, but that the individual's disability affects his ability to receive the benefits of the entity's services. The following discussion by the Fifth Circuit in the context of a Title I employment case is instructive:

[C]onsider the following hypothetical of two hearing-impaired employees:

Thus, a public entity is on notice that an individual needs an accommodation when it knows that an individual requires one, either because that need is obvious or because the individual requests an accommodation. Taking the facts in the light most favorable to Mr. Robertson, there is a genuine issue of fact regarding whether the defendants knew Mr. Robertson needed an auxiliary aid to be afforded the same benefits as non-disabled prisoners in his use of the phone and participation in his probable cause hearing.

First, there is a genuine issue as to whether Mr. Robertson informed the defendants of his need for an accommodation (i.e., whether he made a "request" for an accommodation). Mr. Robertson placed a note in the slot of the cell indicating that he wanted to call his attorney, despite the availability of a phone in his pod. Further, he told the detention officer at the probable cause hearing that he could not hear what was happening. That Mr. Robertson did not request the use of a *specific* auxiliary aid in either instance—such as a TTY, TDD, or closed captioning—does not matter. While it is true that a public entity, in providing an auxiliary aid to prevent discrimination, must "give

> One hearing-impaired employee is an assembly worker who suffers no job limitations as a result of her hearing-impairment disability; she is able to perform the essential functions of her job without accommodation. The other hearing-impaired employee, however, is a telephone operator who, because of her inability to hear, is limited in her ability to perform the essential functions of her job; this disabled employee may require a reasonable accommodation as a result of her impairment. Both employees are disabled, but only one employee is limited by her disability [and therefore requires an accommodation].

*Taylor*, 93 F.3d at 164. Similarly, a hearing-impaired prisoner may not require an accommodation to receive the benefits of a non-aural service, such as access to gym facilities, but may obviously require an accommodation to receive the benefits of a service involving aurally communicative activity, such as participation in a class.

-23-

primary consideration to the requests of the individual with disabilities," 28 C.F.R. § 38.150(b)(2), the regulations do not require the plaintiff to request a *specific* auxiliary aid. Hence, for both Mr. Robertson's use of the phone and his participation in the probable cause hearing, there is a question of fact with respect to whether Mr. Robertson informed the detention facility of his need for an accommodation.

Second, even if a fact finder concluded that Mr. Robertson did not so inform the facility, it could still find that the defendants were on notice of Mr. Robertson's need for an accommodation to use the phone and to participate in his probable cause hearing if that need was "obvious" to the defendants. As noted above, there is a genuine issue of fact regarding whether the defendants knew Mr. Robertson is deaf. Practically speaking, if they knew Mr. Robertson is deaf, there is a question of fact regarding whether his need for an accommodation was obvious when he attempted to use prison services necessarily involving aural communication.

With respect to Mr. Robertson's use of the phone, the record reveals that when Mr. Robertson was arrested, he initiated a phone call to his attorney (via his niece) using a relay service installed on his home computer, rather than a traditional telephone. Deputy Emery was present for this phone call and was also the one who informed prison workers that Mr. Robertson had difficulty hearing. In addition, Mr. Robertson left a note indicating he wanted to contact his attorney, despite the presence of a phone in the pod. Although Mr. Robertson never specifically stated that he could not use the phone in the pod to make a phone call, the totality of the circumstances present at least a fact question

-24-

as to whether it was obvious that Mr. Robertson needed an auxiliary aid to be afforded an equal opportunity to use the phone. Similarly, there is a genuine issue of fact as to whether it was obvious that Mr. Robertson needed an auxiliary aid to participate in his probable cause hearing. He specifically told the officer present that he could not hear what was happening. In sum, the only question before this Court on summary judgment is whether there is sufficient evidence in the record for a reasonable jury to conclude that the detention facility knew that Mr. Robertson had a substantially limiting hearing impairment and that he needed an auxiliary aid or service to afford him an equal opportunity to use the phone and to participate in his probable cause hearing. Because the record contains this evidence, summary judgment is inappropriate.

Nevertheless, the defendants maintain that they did not discriminate against Mr. Robertson because they never specifically refused him access to a telephone. Instead, they suggest, when Mr. Robertson did ask to make a phone call by placing a note in the slot, it was too late to accommodate his request. In other words, the defendants appear to argue that they cannot be held liable for failing to provide Mr. Robertson with an auxiliary aid for the telephone because they did not have enough time to accommodate his request. The defendants' suggestion appears to invoke the exception under 28 C.F.R. § 35.164 that a public entity need not take any action that would result in an undue administrative burden. But whether this exception applies here presents a question of fact. The facility had several hours between the time Mr. Robertson asked to make a phone call and the time he was taken to his probable cause hearing. The defendants cite

-25-

no authority suggesting that the protections of the ADA apply only to detentions that last a certain period of time. Moreover, even if an action, such as obtaining a TTY or TDD, would result in an undue administrative burden, the public entity must "take any *other* action that would not result in . . . such burdens but would nevertheless ensure that, *to the maximum extent possible*, individuals with disabilities receive the benefits or services provided by the public entity." 28 C.F.R. § 35.164 (emphasis added). Here, the facility took *no action* in response to Mr. Robertson's request to call his attorney.

Finally, the defendants argue that they did not discriminate against Mr. Robertson with regard to his probable cause hearing because (1) his lawyer attended the hearing on his behalf, and Mr. Robertson's presence at the hearing was therefore not required, and (2) the charges against Mr. Robertson were dismissed, and therefore, Mr. Robertson was not injured as a result of any lack of accommodation. We disagree with both propositions.

Because Mr. Robertson was detained at a facility that permits detainees to attend their probable cause hearings, Mr. Robertson was eligible to participate in this program. *See Yeskey*, 524 U.S. at 210. The defendants' contention that they did not discriminate against Mr. Robertson because his presence at the hearing was not "required" misses the point. Title II applies to those benefits, programs, and services that are considered both "mandatory" and "voluntary." *See id.* at 211 (holding that "participation" in programs, services, and activities includes both mandatory and voluntary participation). Even though his presence was not required, because the facility makes the activity available to

-26-

detainees in general, it must do so on nondiscriminatory terms.

Furthermore, with respect to the second argument, the defendants take too narrow a view of Mr. Robertson's "injury." Though the charges against Mr. Robertson were dismissed, he was denied the ability to participate in his probable cause hearing to the same extent as non-disabled individuals. *See* 42 U.S.C. § 12132 (prohibiting public entities from excluding a qualified individual with a disability "from participation in . . . the services, programs, or activities of a public entity, or . . . subject[ing such individual] to discrimination"); *see also Chisolm*, 275 F.3d at 320, 331 (holding that the jury could find that county court "denied [the plaintiff] the ability to participate in an extradition hearing to the same extent as non-disabled individuals," even though the charges against plaintiff were quashed and the extradition hearing was cancelled). In sum, because genuine issues of fact remain concerning Mr. Robertson's ADA claims, summary judgment is inappropriate.

### III. CONCLUSION

Because we conclude that Mr. Robertson has failed to allege the denial of a constitutional right, we AFFIRM the District Court's entry of summary judgment in favor of Deputies Emery and Basset on Mr. Robertson's § 1983 claim. We also conclude, however, that there are genuine issues of material fact as to whether Mr. Robertson is disabled within the meaning of the ADA, whether the detention facility knew of his disability, and whether the detention facility knew an accommodation was necessary to

-27-

enable him to participate in its services to the same extent as a non-disabled prisoner. We

therefore REVERSE the District Court's entry of summary judgment on Mr. Robertson's

ADA claim and REMAND for further proceedings consistent with this opinion.