**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 2, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

JOSE VALENCIA,

  Plaintiff - Appellant,

v.

OFFICER HEINZ DE LUCA; OFFICER
SEAN STRAHON; OFFICER CASEY
SALAZAR; OFFICER MARK
LEWANDOWSKI; OFFICER ALAN
MASCARENAS, individually and in
their official capacities and as employees
of the Santa Fe Police Department; CITY
OF SANTA FE,

  Defendants - Appellees.

No. 14-2171
(D.C. No. 1:13-CV-00930-JAP-WPL)
(D. N.M.)

---

**ORDER AND JUDGMENT**[*]

---

Before **BRISCOE**, Chief Judge, **McKAY** and **PHILLIPS**, Circuit Judges.

Jose Valencia, appearing pro se, appeals the district court's entry of summary

judgment in favor of defendants on claims arising out of a traffic stop and his arrest.

---

[*]  After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist the determination of this
appeal.  *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G).  The case is therefore
ordered submitted without oral argument.  This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel.  It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Exercising jurisdiction under 28 U.S.C. § 1291, we affirm the district court's thorough and detailed Memorandum Order and Opinion.

## I.    STANDARDS OF REVIEW

Most of the traffic stop and arrest was recorded by the in-unit cameras of the individual defendants, police officers of the Santa Fe, New Mexico, Police Department.[1]  Although our review is de novo, and we construe the evidence in the light most favorable to Mr. Valencia, against whom summary judgment was granted, *Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014), we, like the district court, must "view[] the facts in the light depicted by the video[recording]," *Scott v. Harris*, 550 U.S. 372, 381 (2007).  We therefore cannot adopt a party's version of the facts where "there is clear contrary video evidence." *Thomas v. Durastanti*, 607 F.3d 655, 659 (10th Cir. 2010).  The district court granted qualified immunity to the individual defendants on Mr. Valencia's federal claims, so we must determine whether Mr. Valencia met his burden to show that they "violated a federal constitutional or statutory right and, if so, . . . that the right was clearly established at the time of [their] unlawful conduct." *Estate of Booker*, 745 F.3d at 411.

Mr. Valencia was represented by counsel in the district court, but he appears pro se on appeal.  We therefore liberally construe his pro se appellate filings but do not act as his advocate. *See Yang v. Archuleta*, 525 F.3d 925, 927 n.1 (10th Cir. 2008).

---

[1]    Defendants submitted five video recordings as media exhibits to their summary judgment motion and have filed them in a supplemental appendix on appeal.  We will refer to them by officer name and approximate time.

## II. FACTUAL BACKGROUND

Officer De Luca observed Mr. Valencia driving on Santa Fe's Cerrillos Road at night with front lights that "appeared dimmer than standard headlights and . . . dull orange in color" in comparison with other cars on the road. R., Vol. 1 at 141. Based on that observation, Officer De Luca believed Mr. Valencia was driving with parking lights instead of headlights, in violation of Santa Fe's traffic code, so he made a U-turn, activated his emergency lights, and initiated a traffic stop. Sergeant Strahon pulled in behind Officer De Luca, who was immediately behind Mr. Valencia as Mr. Valencia made a left turn off Cerrillos Road while the light was red and a right turn into a gas station, where he parked. In the car with Mr. Valencia were C.T. and J.M., and all three were sixteen or seventeen years old.

When Mr. Valencia gave Officer De Luca his license, registration, and proof of insurance, both officers smelled a strong odor of burnt marijuana emanating from the car. Sergeant Strahon told the occupants that it would be easier if they just surrendered the marijuana or paraphernalia. Someone in the car said they had been smoking "spice," and Mr. Valencia handed Sergeant Strahon a bag of something. Strahon Video at 3:30-4:11.[2] Sergeant Strahon noted the bag was labeled "not for human consumption" and, referring to it as "Cush" and "potpourri," said it was not

---

[2] Both officers claimed Mr. Valencia made the statement and handed over the bag, but the district court declined to consider that testimony because the video evidence was unclear about who made the statement and it did not show what was in the bag.

what he smelled—he smelled "weed." *Id.* at 4:11-43. C.T. then handed Officer De Luca a "roach" (the remainder of a marijuana cigarette) and said they had been smoking it "on and off." De Luca Video at 5:20-24.

Officer De Luca obtained the names and birthdates of Mr. Valencia's passengers, neither of whom had identification, but when he ran their information through law enforcement databases, he was unable to obtain anything on J.M. Meanwhile, Mr. Valencia asked Sergeant Strahon if he could put on his jacket, which was on the back seat. Sergeant Strahon patted down the jacket for weapons, found none, and handed it to Mr. Valencia. Officer De Luca then returned, gave Mr. Valencia a citation for driving without headlights, and returned his paperwork to him. Officer De Luca next mentioned the marijuana smell and asked for permission to search the car. Mr. Valencia declined, saying that he had spoken with his father, who advised him not to do anything until his father arrived.

Officer De Luca went to the passenger side to get additional personal information from the passengers, but J.M. could not or would not provide his address or social security number. As Officer De Luca was talking to the passengers, Officer Salazar arrived. He approached the driver's side and asked Mr. Valencia several times for the keys, which were still in the ignition. After declining several times, Mr. Valencia gave the keys to Officer Salazar, who placed them on the roof.

Officer De Luca informed Sergeant Strahon that J.M. did not know his home address or social security number and that his information had not come back from

- 4 -

the databases Officer De Luca had searched. Concerned that J.M. was trying to conceal his identity, Sergeant Strahon tried to open the rear passenger door where J.M. was sitting, but it was locked. He asked J.M. to step out of the car, but Mr. Valencia told J.M. not to get out and allegedly rolled up the windows. When Sergeant Strahon told Mr. Valencia he needed J.M. out of the car, Mr. Valencia questioned his authority absent a warrant. Sergeant Strahon said he did not need a warrant to remove J.M. and, for safety reasons, directed Officers De Luca and Salazar to take Mr. Valencia out of the car. Officer Salazar opened the driver's door, and both he and Officer De Luca asked Mr. Valencia repeatedly to get out of the car while attempting to pull him out. Mr. Valencia refused, bracing his legs against the floorboard and grabbing onto the steering wheel.

During the ensuing two-minute struggle with Officers De Luca and Salazar, Mr. Valencia continuously argued with them, claiming they were hurting him and that he would come out if they let go. Toward the end of the struggle, Sergeant Strahon told Mr. Valencia that he was obstructing the officers by telling J.M. not to get out and by refusing to get out himself, all of which Mr. Valencia denied. After Officer De Luca began to twist Mr. Valencia's left wrist and arm and use pressure points, the officers were able to get Mr. Valencia out and handcuff him.

Meanwhile, J.M. told Sergeant Strahon he did not know his address because he had just moved. He then stepped out of the car, and Sergeant Strahon handcuffed him and placed him in a patrol car.

- 5 -

A search of Mr. Valencia revealed, among other things, a diabetes test kit and a plastic bag in his jacket pocket containing a substance that field-tested as marijuana. During that search, Officers Lewandowski and Macarenas arrived. Officer Lewandowski noted the strong odor of marijuana coming from Mr. Valencia's car. He had C.T. call his mother, then spoke to her himself, informing her of the situation and that she would have to pick up her son at the police station. Officer Lewandowski searched C.T. and placed him in a patrol car. After reading him his Miranda rights, Officer Lewandowski questioned C.T., who said he, Mr. Valencia, and J.M. had been at a festival and "made a very stupid choice" to "smoke in the car." Lewandowski Video at 15:32-45. He clarified that they had "smoked pot, . . . a pretty big joint." *Id.* at 15:47-57. A search of Mr. Valencia's car uncovered a small vial of a green leafy substance, but there is no indication that the substance was ever identified.

When Mr. Valencia's father arrived, he informed the officers that his son has Type I diabetes but declined their offer to call for medical assistance. *See* Salazar Video at 42:50-43:30, 50:10-38. The officers photographed Mr. Valencia with his jacket off, and in response to questioning, Mr. Valencia said he was not injured or in pain. The officers released Mr. Valencia and the car, which his father owned, to his father's custody. The traffic citation and the charges against Mr. Valencia (resisting arrest, obstruction, and possession of marijuana) were eventually dismissed.

Mr. Valencia then brought this action. He asserted claims against the individual officers under 42 U.S.C. § 1983, alleging they violated his Fourth Amendment rights against unlawful detention and seizure and the use of excessive force, and his First Amendment free-speech rights. He also advanced claims against all the officers under New Mexico law for assault, battery, false arrest, false imprisonment, and violation of the New Mexico Children's Code. He further claimed Officer De Luca maliciously prosecuted him in violation of state law, and the City of Santa Fe was liable for negligent hiring, training, and retention of the defendant officers and under the doctrine of respondeat superior.

## III. DISTRICT COURT'S DECISION AND OUR ANALYSIS

### A. The stop

Defendants filed a motion for summary judgment, with the individual officers asserting qualified immunity. The district court granted that motion. The court first concluded Officer De Luca had reasonable suspicion of a traffic violation, which justified the initial stop. *See United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995) (en banc) (holding that "a traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring"). The court observed that Officer De Luca's dashboard camera showed that although Mr. Valencia's headlights were in fact on, they appeared duller and dimmer than the bright white headlights of other cars captured on

- 7 -

the recording, and the video evidence supported Officer De Luca's affidavit testimony that the headlights on Mr. Valencia's car did not illuminate the road in front of him very brightly when he made the left turn off Cerrillos Road or the right turn into the gas station. The court concluded it was reasonable under the circumstances for Officer De Luca to think the headlights were off. *See United States v. DeGasso*, 369 F.3d 1139, 1144 (10th Cir. 2004) ("An officer's reasonable mistake of fact, as distinguished from a mistake of law, may support the probable cause or reasonable suspicion necessary to justify a traffic stop.").[3]

We agree with the district court's analysis on this issue. Although Mr. Valencia's lights were on and the citation was ultimately dismissed, that does not undermine the reasonableness of Officer De Luca's suspicion at the time of the stop, given the video evidence. Nor is Officer De Luca's suspicion undermined by

---

[3] Even though Officer De Luca's video footage clearly showed Mr. Valencia ran the red light when he made the left off Cerrillos Road, the court did not base its reasonable-suspicion analysis on that fact because by then, Officer De Luca had already activated his emergency lights, and in the absence of probable cause, a nonconsensual traffic stop must be "justified at its inception," *United States v. Salzano*, 158 F.3d 1107, 1111 (10th Cir. 1998) (internal quotation marks omitted). However, the court considered that violation part of the circumstances the officers were entitled to rely on in the investigation of whether Mr. Valencia was impaired.

The court also considered it immaterial that there were some differences between Officer De Luca's Internal Affairs interview and his affidavit supporting his request for qualified immunity, concluding there were only additional details in the affidavit, which he prepared after admittedly refreshing his recollection of the incident by watching the videotapes. We see no error in that conclusion.

Mr. Valencia's allegation that, during his five-mile drive on Cerrillos Road, he drove past other police officers without getting pulled over.

### B. Extension of the stop

We also agree with the district court's conclusion that the officers were justified in extending the duration of the traffic stop because they had reasonable suspicion of criminal activity—possession of marijuana and driving while intoxicated—based on Mr. Valencia's left turn off Cerrillos Road against the light, the marijuana smell, and the roach, which C.T. said was the remains of what they had been smoking. *See United States v. Kitchell*, 653 F.3d 1206, 1217-18 (10th Cir. 2011) (stating settled rule that an officer may extend a traffic stop beyond its original purpose if the officer "acquire[s] a particularized and objective basis for suspecting the particular person stopped of criminal activity" (internal quotation marks omitted)); *United States v. Bradford*, 423 F.3d 1149, 1160 (10th Cir. 2005) (concluding that an officer has probable cause to search entire vehicle when its occupant hands marijuana to the officer); *United States v. Parker*, 72 F.3d 1444, 1450 (10th Cir. 1995) (finding probable cause to search passenger compartment when officer smells marijuana there). The video evidence squarely rebuts Mr. Valencia's arguments that he did not run the light and that C.T. did not hand over the roach and then state that the three had been smoking it. Contrary to Mr. Valencia's argument, the fact that there was no cloud of smoke visible when the officers were first in contact with the vehicle does not establish that the officers did not smell burnt

marijuana.  Further, their claim that they smelled burnt marijuana is clearly supported by other evidence that the three juveniles had smoked marijuana in the car.[4]

## C.  The arrest

The district court next considered whether probable cause supported Mr. Valencia's arrest.  "When a warrantless arrest is the subject of a § 1983 action, the arresting officer is entitled to qualified immunity if a reasonable officer could have believed that probable cause existed to make the arrest."  *Robertson v. Las Animas Cnty. Sheriff's Dep't*, 500 F.3d 1185, 1191 (10th Cir. 2007).  "Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense."  *Id.* (internal quotation marks omitted).  The court reasoned that, from the beginning of the traffic stop, there was probable cause to investigate marijuana

---

[4]      Mr. Valencia also relies on *Commonwealth v. Overmyer*, 11 N.E.3d 1054 (Mass. 2014), for the notion that the odor of marijuana is insufficient to establish reasonable suspicion or probable cause.  Setting aside that *Overmyer* is not binding precedent in the Tenth Circuit, Mr. Valencia's reliance on it is misplaced because the case concerned whether the odor of unburnt marijuana alone established probable cause to believe that a vehicle contains criminal contraband or evidence of a crime, *see id.* at 1055.  Here, the officers had more than simply odor.  Further, *Overmyer* turned on the fact that, in Massachusetts, possession of less than one ounce of marijuana is a civil violation, not a criminal one, and there was no evidence the officers could, by smell, discern a criminal quantity of marijuana.  *Id.* at 1057-60.  In the absence of a prescription, New Mexico makes first-time possession of "one ounce or less of marijuana . . . a petty misdemeanor," N.M. Stat. Ann. § 30-31-23(B), so the smell of burnt marijuana would be a sufficient basis for reasonable suspicion of criminal activity where, as here, there is no evidence of a prescription.

possession or driving while intoxicated, and in connection with that investigation, it was reasonable and lawful to order Mr. Valencia to get out of the car. *See Bradford*, 423 F.3d at 1160; *Parker*, 72 F.3d at 1450; *Maryland v. Wilson*, 519 U.S. 408, 415 (1997) (holding that an officer does not violate the Fourth Amendment when, during a lawful traffic stop, he orders passengers to get out of the vehicle); *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1977) (per curiam) (same with respect to the driver). Therefore, the court concluded, the officers had probable cause to arrest Mr. Valencia for marijuana possession, driving while intoxicated, and for resisting and obstructing.[5]

We agree, and nothing in Mr. Valencia's appellate briefs persuades us to the contrary. We reject his contention that the officers planted the baggie on him, which he bases on the fact that Sergeant Strahon did not find the baggie when he patted down Mr. Valencia's jacket for weapons and that the baggie fell to the ground and blew a short distance away during the search of Mr. Valencia. Sergeant Strahon did not exhaustively search the jacket for drugs but only felt for weapons, and although somewhat dark and grainy, the videos show Officer De Luca pulling a baggie out of the breast pocket of Mr. Valencia's jacket, the baggie falling to the ground, and

---

[5] The court referred to natural and synthetic marijuana, the latter of which is also illegal in New Mexico absent a prescription, but the court had earlier stated it would not credit testimony that it was Mr. Valencia who said they had been smoking "spice" and handed over a bag of "spice," which is apparently a term used for synthetic marijuana. Because there clearly was probable cause to arrest Mr. Valencia with regard to natural marijuana, any error in the court's reference to synthetic marijuana at this point was harmless.

- 11 -

Officer Strahon retrieving it.  De Luca Video at 29:28-45; Strahon Video at 28:54-29:10.  Further, the district court did not rest its probable-cause determination on Sergeant Strahon's belief that J.M. was concealing his identity or that Mr. Valencia may have falsely imprisoned J.M. when he allegedly rolled up the windows and locked the doors.  It is therefore immaterial whether those beliefs were, as Mr. Valencia claims, a ruse.

## D.  Removal by force

The district court next concluded the force used to remove Mr. Valencia from the car was objectively reasonable in light of the circumstances.  *See Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1314 (10th Cir. 2002) (stating qualified-immunity analysis considers whether force was "objectively reasonable in light of the facts and circumstances," including the severity of the alleged crime, the degree of suspect's "potential threat," and his "efforts to resist or evade arrest" (internal quotation marks omitted)).  The court observed that pulling on Mr. Valencia, using pressure points, and twisting his wrist and arm was no greater force than the force we considered reasonable in *Mecham v. Frazier*, 500 F.3d 1200, 1203, 1204-05 (10th Cir. 2007), which involved the use of pepper spray to the face and the physical removal of a resistant traffic-stop suspect.[6]

---

[6]     The court also cited two cases from other circuits where qualified immunity was granted to officers who used similar techniques and degrees of force in removing traffic-stop suspects from their vehicles.  *See Lawrence v. Kenosha Cnty.*, 391 F.3d 837, 843 (7th Cir. 2004); *McGruder v. Heagwood*, 197 F.3d 918, 920 (8th Cir. 1999).

We again agree with the court's analysis, especially given that the officers had the lawful authority to remove Mr. Valencia from the car and that the amount of force used was minimal in comparison with more drastic techniques, such as the use of pepper spray, tasers, or batons, all of which the officers claimed they did not use because Mr. Valencia was a juvenile. Mr. Valencia claims the officers could not remove him because he was still wearing his seat belt, and once he unfastened it, he got out "voluntarily." Aplt. Opening Br. at 17; Reply at 2, 5. We reject those claims. Mr. Valencia alleged in his complaint that he was "forcibly extracted," R., Vol. 1 at 18, and the video evidence conclusively shows that he did not get out of the car "voluntarily." At one point during the struggle, he says, "If I let go, I'm going to hit my head," De Luca Video at 27:57-59, which is contrary to his self-serving attestation that he was not holding on to the steering wheel or otherwise bracing himself inside the car but was instead simply belted into his seat. *See Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002) (stating that, in evaluating summary judgment proceedings, "[w]e do not consider [a nonmovant's] conclusory and self-serving affidavits" (internal quotation marks omitted)). Thus, although one officer was able to obtain control of his left arm, it is beyond dispute that Mr. Valencia was physically maintaining himself in the car (the exact manner is immaterial), and he points to no clearly established law that would suggest to a

- 13 -

reasonable officer that pulling him out of his car by his arms and, he claims, head and neck, constituted excessive force.[7]

### E. First Amendment claim

To prevail on his First Amendment retaliatory-arrest claim, Mr. Valencia had to show "he was engaged in constitutionally protected activity," "the government's actions caused him injury that would chill a person of ordinary firmness from continuing to engage in that activity," and that the officers' "actions were substantially motivated as a response to his constitutionally protected conduct." *Stonecipher v. Valles*, 759 F.3d 1134, 1147 (10th Cir.), *cert. denied*, 135 S. Ct. 881 (2014). The district court found no evidence that the officers were substantially motivated to arrest him by anything Mr. Valencia said during the incident. Instead, the court concluded that the officers were substantially motivated (and justified) in arresting Mr. Valencia when he physically resisted lawful orders to step out of the car. We agree with that conclusion. Certainly, part of Sergeant Strahon's motivation in ordering Officers De Luca and Salazar to take Mr. Valencia out of the car was

---

[7] Although Mr. Valencia averred that there are medical records showing he suffered serious physical and emotional injuries, he provided no evidence of the nature or extent of any injuries such that they might bear on the reasonableness of the force used. *See Cortez v. McCauley*, 478 F.3d 1108, 1129 (10th Cir. 2007) (stating that Fourth Amendment excessive-force claim requires more than a *de minimis* physical or emotional injury); *see also Garrett*, 305 F.3d at 1213 (declining to consider nonmovant's "conclusory and self-serving affidavits" when evaluating summary judgment proceedings (internal quotation marks omitted)). Further, he disclaimed injury just before he was released to his father's custody, and the post-arrest video footage of him without his jacket on shows no obvious injury.

- 14 -

Mr. Valencia's statement that a warrant was necessary to remove J.M. from the car and his instruction that J.M. not get out. But as the district court noted, Mr. Valencia's warrant argument was legally incorrect, *see Wilson*, 519 U.S. at 415; *Mimms*, 434 U.S. at 111 n.6, and we are unaware of any clearly established free-speech right to wrongfully instruct another person to disobey a police officer's lawful order. The district court properly granted qualified immunity on this claim.

### F. State law tort claims

The court next held that Mr. Valencia's state-law tort claims (assault, battery, false arrest, false imprisonment) and his malicious abuse of process claim failed because the officers had probable cause to arrest him and did not use excessive force. *See Dickson v. City of Clovis*, 242 P.3d 398, 404 (N.M. Ct. App. 2010) (stating that such claims "presuppose" a lack of "probable cause to arrest"). We see no error in that conclusion, or in the court's disposition of Mr. Valencia's remaining state-law claims. His claim under the New Mexico Children's Code failed because he was released to his father's custody, not sent to a detention center. *See* N.M. Stat. Ann. § 32A-2-11(A) (prohibiting placement of a juvenile in detention unless an assessment shows he is a risk to himself or others, or that he may leave the jurisdiction). His claim against the City of Santa Fe for negligent hiring, training, and retention of the defendant officers failed because the officers did not proximately cause any tort for which the state waived sovereign immunity. *See Ortiz v. N.M. State Police*, 814 P.2d 117, 118-19 (N.M. Ct. App. 1991) (recognizing sovereign immunity is waived for

such a claim when the subordinates proximately cause an underlying tort). And because the defendant officers had not themselves committed any tort for which sovereign immunity was waived, his respondeat superior claim against the City failed. *See Silva v. State*, 745 P.2d 380, 385 (N.M. 1987) (explaining that a respondeat superior claim against a governmental entity requires an underlying tort by the entity's employee).

## IV.    CONCLUSION

The judgment of the district court is affirmed. Mr. Valencia's motion to proceed on appeal without prepayment of costs or fees is granted, and we remind him of his obligation to continue making partial payments until his entire filing fee has been paid in full.

Entered for the Court


Mary Beck Briscoe
Chief Judge

- 16 -