FILED
United States Court of Appeals
Tenth Circuit

February 19, 2016

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

J. V. and M. Q., on behalf of their minor
child C. V.,

     Plaintiffs - Appellants,

v.

ALBUQUERQUE PUBLIC SCHOOLS,

     Defendant - Appellee.

No. 15-2071

_____

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. No. 1:13-CV-01204-MV-KBM)**
_____

Joseph P. Kennedy (Michael L. Timm, Jr., with him on the briefs), Kennedy Kennedy &
Ives, LLC, Albuquerque, New Mexico, appearing for Appellants.

Emil J. Kiehne (Jennifer G. Anderson and Megan T. Muirhead, with him on the brief),
Modrall, Sperling, Roehl, Harris & Sisk, P.A., Albuquerque, New Mexico, appearing for
Appellees.
_____

Before **HOLMES**, **MATHESON**, and **MORITZ**, Circuit Judges.
_____

**MATHESON**, Circuit Judge.
_____

When C.V. was a seven-year-old second grade student at an elementary school

operated by Albuquerque Public Schools ("APS"), he was eligible for special education

benefits for autism. During two hours on the morning of November 14, 2011, C.V.

disrupted his class, ran away from APS staff, kicked an APS social worker, and kicked

and shot rubber bands at APS School Security Officer Xiomara Sanchez. To protect C.V.

and others, Officer Sanchez handcuffed him to a chair. Before doing so, Officer Sanchez

had called C.V.'s mother, who granted permission to restrain him, and repeatedly warned

C.V. to calm down. Officer Sanchez was unaware of C.V.'s disability.

C.V.'s parents ("Appellants") sued under Title II of the Americans with

Disabilities Act ("ADA"), claiming APS denied C.V. a protected benefit and

discriminated against him. The district court granted summary judgment to APS.

Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I. **BACKGROUND**

### A. *Factual History*

In 2011, C.V. attended Mary Ann Binford Elementary School in Albuquerque. He

weighed approximately 50 pounds and was four feet one inch tall. His second-grade

teacher, Paula Gutshall, was assisted by Ms. Trujillo.

During the previous year, his mother, M.Q., worked with Ms. Gutshall and an

APS social worker, Maria Martinez, to develop a Behavioral Intervention Plan ("BIP"),

which outlined strategies for correcting aspects of C.V.'s behavior. It did not include a

physical restraint strategy. C.V. was tested and determined to be eligible for special

education services for autism and for being gifted. It is undisputed that C.V.'s autism

qualifies him as disabled under the ADA.

On the morning of November 14, 2011, Ms. Trujillo told Ms. Martinez that C.V.

had been disrupting class and misbehaving. Ms. Martinez offered to take C.V. to her

classroom. While in Ms. Martinez's classroom, C.V. continued to act out—hitting toys and throwing his shoes at her. Ms. Martinez called the assistant principal, Misti Miller, for help. Ms. Miller asked Ms. Martinez to bring C.V. to the principal's office. Before they reached the office, C.V. ran away from Ms. Martinez.

Ms. Martinez and Ms. Miller attempted to locate C.V. to keep him from leaving campus. Ms. Martinez also attempted to call C.V.'s mother so she could come to the school and help calm C.V. Ms. Martinez left several messages between 11:15 and 11:30 a.m., but was unable to reach M.Q. She was able to reach C.V.'s father, but he refused to come to the school because he was busy at work.

C.V. ran into the school nurse's office, where he locked himself in a bathroom. He next ran out of the nurse's office and into the cafeteria. At approximately 12:15 p.m., Officer Sanchez, an APS security officer, was dispatched to the school based on a report that a child was out of control. The record does not indicate who called APS and made this report. When she first arrived at the school, Officer Sanchez met with the principal and assistant principal, who informed her C.V. had been running around the school and causing problems since approximately 10:30 a.m.

The principal, Cecilia Sanchez, escorted Officer Sanchez to the cafeteria. When C.V. saw the principal and Officer Sanchez, he ran away. Officer Sanchez went to the school office to call C.V.'s parents. She first spoke with C.V.'s father, who said he was at the airport and unable to come to the school until after 2:30 p.m. He told Officer Sanchez to call C.V.'s mother.

Officer Sanchez reached C.V.'s mother, M.Q. Officer Sanchez identified herself as "school security," and informed M.Q. that she needed to pick C.V. up from school. Aplt. App. at 141. M.Q. said she would come, but it would take approximately 30 minutes because she first needed to pick up her younger son from preschool. Officer Sanchez asked M.Q. for permission to restrain C.V. M.Q. responded, "Yes." *Id.* at 141. M.Q. apparently did not understand that Officer Sanchez was seeking permission to handcuff C.V. Rather, she thought that a trained member of C.V.'s behavioral intervention team would hug or hold him to calm him down.

C.V. was ultimately led to a room, Room 127. When Officer Sanchez arrived at Room 127, C.V. charged at her and attempted to run out of the room. Officer Sanchez blocked the door to prevent C.V. from leaving. C.V. kicked his legs and swung his arms to knock items off of the desks in the room. He also pulled computer power cables out of the wall sockets. Ms. Martinez approached C.V. and asked him to stop because he was in danger of harming himself. C.V. started swinging a power cord at Ms. Martinez in an attempt to hit her. He then lay on his back and kicked Ms. Martinez. He made contact with her several times, causing her to experience pain.

When Officer Sanchez would not let him leave the room, C.V. kicked her in the shin. Officer Sanchez repeatedly said, "You're not going out." *Id.* at 131. C.V. continued to move around. He finally sat on the floor with his legs crisscrossed, which Ms. Martinez considered to be safe. At this point, the phone rang, and someone told Ms. Martinez that C.V.'s mother had arrived at the school.

Ms. Martinez then heard Officer Sanchez say, "Don't do that," and looked up to see C.V. playing with a rubber band. *Id.* at 132. Officer Sanchez said, "Don't do that, [C.V.]. Give me the rubber band." *Id.* C.V. was pointing the rubber band at Officer Sanchez's face. He shot it at her and hit her somewhere in the knee. Officer Sanchez told him not to do it again. He shot it again and hit her in the chest. C.V. crawled over to retrieve the rubber band.

Officer Sanchez stepped on the rubber band to prevent C.V. from shooting it a third time. C.V. then began tugging Sanchez's leg in an attempt to take the rubber band. When he could not retrieve it, C.V. started to kick Officer Sanchez.[1] Officer Sanchez warned C.V. if he did not stop, she would place him in handcuffs.

---

[1] Appellants dispute that C.V. kicked Officer Sanchez after he was unable to retrieve the rubber band. They rely on Ms. Martinez's deposition testimony in which she did not clearly state that C.V. kicked Officer Sanchez before Officer Sanchez handcuffed him. Ms. Martinez's signed affidavit states the following:

> C.V. then began to shoot rubber bands at Officer Sanchez. Officer Sanchez warned C.V. several times to stop shooting rubber bands at her. C.V. then began to kick Officer Sanchez in the legs. Officer Sanchez warned C.V. to stop kicking or he would be placed in handcuffs.

*Id.* at 66-67.

In her deposition testimony, Ms. Martinez omitted this portion of the events but did state that C.V. was "[k]icking and kicking and kicking, and [Officer Sanchez] is standing with him and she is getting her handcuffs out and he is kicking and kicking and kicking." *Id.* at 135. In light of this testimony and the sworn affidavit, the district court correctly determined it was undisputed that C.V. kicked Officer Sanchez before she handcuffed him. But even if C.V. did not kick Officer Sanchez right before she handcuffed him, this would have no effect on the outcome of the case, as explained below.

C.V. ignored Officer Sanchez's warning. Officer Sanchez said, "[C.V.], what did I just tell you? Get over here and sit down." *Id.* at 134. C.V. got up and, according to Ms. Martinez, "was wiggly and wiggly." *Id.* When C.V. continued to kick and attempted to get off of the chair, Officer Sanchez handcuffed him. *Id.* at 135. Officer Sanchez double locked the handcuffs to prevent them from tightening. She ensured there was a thumb-width of space, or approximately one inch, between the handcuffs and C.V.'s wrist.

C.V. stood up in the chair and then sat back down while yelling he wanted the handcuffs removed. Officer Sanchez advised C.V. if he sat in the chair and settled down, she would immediately take off the handcuffs. C.V. stood up several more times and at one point dragged the chair towards Officer Sanchez and tried to kick her. C.V. continued to kick and struggle while in the handcuffs.

After approximately 15 minutes, APS Officer Villonez arrived. C.V. was struggling and kicking. C.V. stood up and seemed like he was going to charge at Officer Villonez, who ordered C.V. to sit and calm down.

Approximately 30 seconds later, M.Q. entered the room. She demanded that Officer Sanchez remove the handcuffs. She took photographs with her cell phone. Officer Sanchez removed the handcuffs. There were welts and scratches on C.V.'s wrists where the handcuffs had cut into him as he struggled. He had been crying.

Before leaving the premises, C.V.'s mother withdrew him from the school. Since this incident, C.V. has not been able to drive by the school or enter the school parking lot

without throwing up. For the remainder of the 2011 to 2012 school year, C.V. attended Los Ranchos Elementary School, another APS school.

B. *Procedural History*

In 2013, Appellants sued APS under the ADA for (1) denial of a benefit (access to education) and (2) discrimination against C.V., both based on his disability. They pursued three discrimination theories: (1) intentional discrimination, (2) disparate impact, and (3) failure to provide a reasonable accommodation.

The district court granted summary judgment to APS. On the denial of benefit claim, the court granted summary judgment because C.V.'s mother—not APS—withdrew C.V. from the school, and C.V. attended a different school in the same school district. On the discrimination claim, the court said the Appellants provided no evidence of intentional discrimination, disparate impact, or a request or an obvious need for a reasonable accommodation.

II. **DISCUSSION**

We affirm summary judgment on both ADA claims because Appellants failed to show that APS or any of its staff took action against C.V. by reason of his disability. Appellants have not otherwise shown a triable issue as to whether APS denied C.V. access to education or that APS intentionally discriminated against C.V., implemented policies that imposed a disparate impact on disabled students, or failed to act on a request or obvious need for a reasonable accommodation.

## A. *Standard of Review at Summary Judgment*

We review a grant of summary judgment de novo. *Osborne v. Baxter Healthcare Corp.*, 798 F.3d 1260, 1266 (10th Cir. 2015). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is genuine "if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013) (quotations omitted); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of fact is material "if under the substantive law it is essential to the proper disposition of the claim." *Becker*, 709 F.3d at 1022 (quotations omitted); *see Anderson*, 477 U.S. at 248.

## B. *ADA Background*

Title II of the ADA states, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To have a viable claim, a plaintiff must prove:

> (1) that he or she is a qualified individual with a disability;
> (2) that he or she was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and
> (3) that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability.

*Gohier v. Enright*, 186 F.3d 1216, 1219 (10th Cir. 1999) (quotations and brackets omitted). Based on the second element, courts have recognized two types of claims:

(1) exclusion from or denial of benefits and (2) discrimination. *Id.* Appellants allege both. Both require proof of the foregoing three elements, including proof that any denial of benefits or discrimination was "by reason of the plaintiff's disability." *Id.*

Courts have recognized three ways to establish a discrimination claim: (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation. *See Cinnamon Hills Youth Crisis Ctr., Inc. v. Saint George City*, 685 F.3d 917, 919 (10th Cir. 2012); *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 573 (2d Cir. 2003).

We recently applied Title II to an officer's response to a disabled student's conduct in *J.H. ex rel. J.P. v. Bernalillo County*, 806 F.3d 1255 (10th Cir. 2015). In that case, an officer arrested an eleven-year-old student in a special needs class for kicking a teacher. 806 F.3d at 1256-57. We said that a Title II plaintiff must show a defendant acted "by reason of an individual's disability." *Id.* at 1260. We held the plaintiff's ADA claim failed because the officer arrested the student for her assaultive conduct, not based on her disability: "It was th[e] battery, rather than a disability, that led to the arrest." *Id.*

### C. *Analysis*

Our role is not to opine on whether it was wrong to handcuff C.V. We address only whether Appellants are entitled to relief under the ADA. We affirm summary judgment for APS on both of Appellants' ADA claims. First, Appellants failed to show that APS handcuffed C.V. by reason of his disability. Further, as to their denial of benefit claim, Appellants fail to show C.V. was denied access to education. As to their discrimination claim, Appellants failed to show APS intentionally discriminated against

C.V., implemented policies that imposed a disparate impact on disabled students, or failed to respond to a request or obvious need for a reasonable accommodation.

1. **By Reason of a Disability**

Both ADA claims require proof that APS either denied a benefit or discriminated by reason of C.V.'s disability.  Because Appellants did not provide such evidence, APS is entitled to summary judgment.

Our recent decision in *Bernalillo County* addressed a similar claim and supports affirmance here.  In that case, we rejected the claim that an officer violated the ADA when he arrested a disabled student for kicking a teacher, holding the officer acted based on the student's conduct and not his disability.  806 F.3d. at 1257, 1260.  In this case, Officer Sanchez, like her counterpart in *Bernalillo County*, handcuffed C.V. based on his conduct—two hours of disruptive behavior, including running from room to room and kicking Ms. Martinez and Officer Sanchez and refusing to stop—not by reason of his disability.[2]

Instead of offering evidence that Officer Sanchez's handcuffing of C.V. or any other action taken by APS staff was "by reason of [C.V.'s] disability," § 12132, Appellants contend C.V.'s behavior was a "manifestation[] of his disability," Aplt. Br. at 26.  Appellants fail to cite any evidence showing his conduct indeed was a manifestation

___

[2] In *Bernalillo County*, we recognized that an ADA discrimination claim may be viable when a plaintiff's "disability might cause the police to incorrectly suspect that an individual committed a crime."  *See* 806 F.3d at 1260 (citing *Lewis v. Truitt*, 960 F. Supp. 175, 176-77, 179 (S.D. Ind. 1997)).  As in *Bernalillo County*, we do not find that circumstance present in this case.

of his disability. Also, they cite no authority suggesting a school may not regulate a student's conduct if that conduct is a manifestation of a disability. Rather, as *Bernalillo County* indicated, a student's conduct may be regulated, so long as action is not taken by reason of the student's disability. 806 F.3d at 1260.

Because Title II claims require a showing that a public entity acted "by reason of" a person's disability, and because Appellants have failed to provide evidence that APS or its staff took any action by reason of C.V.'s disability, all their claims fail.

Even if Appellants' lack of proof on the third element of an ADA claim—the "by reason of" element—is not dispositive of all of their claims, each claim also fails for lack of proof on the second element—that C.V. "was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities, or was otherwise discriminated against by [APS]." *Gohier*, 186 F.3d at 1219 (quotations omitted).

2. **Denial of Benefit**

Appellants provide no authority to support their argument that C.V. was denied access to education when Officer Sanchez handcuffed him or when his mother withdrew him from one school operated by APS and enrolled him in another APS school.

Any educational interference from Officer Sanchez's handcuffing C.V. to his chair was the product of C.V.'s behavior. Moreover, Appellants provide no authority suggesting a 15-minute interference with a disabled child's education can be considered a denial of benefits under Title II. Appellants do cite evidence that C.V. had lasting emotional trauma from this incident. C.V. would throw up when driving by the school

- 11 -

and experienced fear and anxiety around police officers.  But this evidence alone does not create a genuine issue of material fact as to whether APS kept C.V. from attending or learning at school.  The evidence showed just the opposite—C.V. was enrolled at another APS school after the incident and completed the school year there.

Appellants' cases are inapposite because they involve pervasive and continual interference with disabled students' education.  *See S.S. v. E. Ky. Univ.*, 532 F.3d 445, 454 (6th Cir. 2008); *K.M. ex rel. D.G. v. Hyde Park Cent. Sch. Dist.*, 381 F. Supp. 2d 343, 360 (S.D.N.Y. 2005); *T.K. v. N.Y.C. Dep't of Educ.*, 32 F. Supp. 3d 405, 419 (E.D.N.Y. 2014).

APS is therefore entitled to summary judgment on Appellants' denial of benefits claim.

### 3.  **Discrimination Claim**

Appellants assert all three ADA discrimination theories:  (1) intentional discrimination (disparate treatment), (2) disparate impact, and (3) failure to make a reasonable accommodation.  They contend APS's failure to train its security officers on how to calm disruptive disabled students supports each theory.

This circuit has not recognized a failure-to-train claim of discrimination under the ADA, but we have not foreclosed the possibility.  *See Gohier*, 186 F.3d at 1222 (noting that "Gohier might have argued that Title II required Colorado Springs to better train its police officers to recognize reported disturbances that are likely to involve persons with mental disabilities, and to investigate and arrest such persons in a manner reasonably accommodating their disability" but declining to recognize such a claim); *Sperry v. Maes*,

- 12 -

592 F. App'x 688, 698 (10th Cir. 2014) ("[W]e do not have to determine whether such a [failure-to-train ADA] claim exists."), *cert. denied*, 136 S. Ct. 44 (2015).[3]

As in *Gohier* and *Sperry*, we need not determine whether failure to train could establish ADA liability[4] because Appellants failed to provide evidence to support any of the discrimination theories.[5]

---

[3] Although this and other cases cited in this opinion are unpublished and therefore not precedential, we cite them for their persuasive value. *See* Fed. R. App. P. 32.1; 10th Cir. R. 32.1(A).

[4]The First Circuit has declined to determine whether such a claim exists. *See Buchanan v. Maine*, 469 F.3d 158, 177 (1st Cir. 2006).
The Sixth Circuit said "the failure to train officers on how to comply with the ADA is not intentional discrimination," *Everson v. Leis*, 412 F. App'x 771, 780 n.3 (6th Cir. 2011) (unpublished), and that failure to train is more properly considered under a disparate impact theory, *see Dillery v. City of Sandusky*, 398 F.3d 562, 568 (6th Cir. 2005) ("The failure of Sandusky to install handicapped-accessible sidewalks and to train its employees about the ADA affects all disabled persons, not just Dillery. Thus, Dillery cannot demonstrate that Sandusky intentionally discriminated against her specifically by failing to undertake these actions.").
Other courts have recognized such a claim, but have not stated how it fits within the framework of ADA Title II discrimination theories. *See Camarillo v. Carrols Corp.*, 518 F.3d 153, 158 (2d Cir. 2008) (recognizing a failure to train claim under Title III of the ADA); *Estate of Saylor v. Regal Cinemas, Inc.*, 54 F. Supp. 3d 409, 424 (D. Md. 2014); *Schorr v. Borough of Lemoyne*, 243 F. Supp. 2d 232, 235 (M.D. Pa. 2003).

[5] In any event, this claim runs afoul of this court's conclusion in *Bernalillo County* that "the county could incur liability for failure to train only if Deputy Sharkey had committed a constitutional or [ADA] violation." 806 F.3d at 1262; *see also Rosen v. Montgomery Cty. Md.*, 121 F.3d 154, 156 n.2 (4th Cir. 1997) ("We agree with the district court that this [failure to train] claim hinges on, at the minimum, a ruling that Rosen's ADA rights were violated.").

### a. *Intentional Discrimination*

Appellants assert APS's deliberate indifference to C.V.'s disability constituted intentional discrimination against him. Their reliance on APS's failure to train does not begin to show deliberate indifference.

We have recognized that "'intentional discrimination can be inferred from a defendant's deliberate indifference to the strong likelihood that pursuit of its questioned policies will likely result in a violation of federally protected rights.'" *Barber ex rel. Barber v. Colo. Dep't of Revenue*, 562 F.3d 1222, 1228-29 (10th Cir. 2009) (quoting *Powers v. MJB Acquisition Corp.*, 184 F.3d 1147, 1153 (10th Cir. 1999)); *see also Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001).[6] "Deliberate indifference requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that . . . likelihood." *Duvall*, 260 F.3d at 1139. The failure to act must be "more than negligent" and involve "an element of deliberateness." *Barber*, 562 F.3d at 1228. When the alleged failure to act is an alleged failure to train, we have required a showing that the defendant "was 'on notice' of the need for 'more or different training." *Sperry*, 592 F. App'x at 698 (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 397 (1989)).

---

[6] Although *Barber* articulated the standard for intentional discrimination under the Rehabilitation Act, we apply the same standard to ADA intentional discrimination cases because, "[t]o the extent feasible, we look to decisions construing the Rehabilitation Act to assist us in interpreting analogous provisions of the ADA." *Cohon ex rel. Bass v. N.M. Dep't of Health*, 646 F.3d 717, 725 (10th Cir. 2011) (quotations omitted); *see also Duvall*, 260 F.3d at 1138 (recognizing deliberate indifference as the proper standard for ADA intentional discrimination cases).

Appellants' bare allegation of failure to train officers is not nearly enough to show deliberate indifference. First, they have not shown APS was on notice of the need for more or better training. They did not point to even a single incident of an APS officer having any problem in calming a disabled student before the incident with C.V. Second, even if APS should have provided training, Appellants have not shown that APS was more than negligent in not providing it or that APS's failure to train involved any element of deliberateness. Finally, they have not shown that APS knew that lack of training made harm to a federally protected right substantially likely.

Deliberate indifference/failure-to-train claims arise in civil rights actions under 42 U.S.C. § 1983. *E.g.*, *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 773-74 (10th Cir. 2013). We have relied on § 1983 decisions in addressing failure-to-train ADA claims. *E.g.*, *Bernalillo County*, 806 F.3d at 1262 (citing *Ellis ex rel. Estate of Ellis v. Ogden City*, 589 F.3d 1099 (10th Cir. 2009)); *Sperry*, 592 F. App'x at 698 (citing *City of Canton*). Courts in those cases require stringent proof to establish deliberate indifference. For example, in *City of Canton*, the Supreme Court said a plaintiff must show "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to

- 15 -

the need." 489 U.S. at 390. As stated above, Appellants fall far short of making this showing.[7]

Because Appellants have failed to show deliberate indifference based on lack of training, we affirm summary judgment on their intentional discrimination claim.

b. *Disparate Impact*

Appellants contend APS's policies and failure to train its officers produced a disparate impact on disabled children. APS argued and the district court determined that Appellants waived this argument because they failed to include it in their complaint. The district court also concluded the argument failed because Appellants failed to raise a genuine issue of material fact regarding disparate impact. We agree on both grounds.

"Unlike a claim for disparate treatment, a claim for disparate impact doesn't require proof of intentional discrimination." *Cinnamon Hills*, 685 F.3d at 922; *see also Raytheon Co. v. Hernandez*, 540 U.S. 44, 52, (2003). "To prove a case of disparate impact discrimination, the plaintiff must show that 'a specific policy caused a significant disparate effect on a protected group.'" *Cinnamon Hills*, 685 F.3d at 922 (quoting *Reinhart v. Lincoln Cty.*, 482 F.3d 1225, 1229 (10th Cir. 2007)). "This is generally shown by statistical evidence involving the appropriate comparables necessary to create a reasonable inference that any disparate effect identified was caused by the challenged policy and not other causal factors." *Id.* (quotation and alterations omitted). Moreover, a

---

[7] Moreover, Appellants "have failed to demonstrate that more 'adequate' training to accommodate [disabled students] would have required a different response." *Thao v. City of St. Paul*, 481 F.3d 565, 568 (8th Cir. 2007).

disparate impact claim must allege a pattern or practice of discrimination, not merely an isolated instance of it. *Apsley v. Boeing Co.*, 691 F.3d 1184, 1200 (10th Cir. 2012).

Appellants waived this basis for ADA liability by omitting it from their complaint. Moreover, despite Appellants' assertion that APS's failure to train led to "disabled children, like C.V., [being] handcuffed and restrained for manifestations of their disabilities," Aplt. Br. at 42, Appellants provided no evidence showing any disabled children besides C.V. were ever handcuffed.

We therefore affirm the district court's determination that APS is entitled to summary judgment on Appellants' disparate impact claim.

### c. *Reasonable Accommodation*

Appellants contend APS failed to accommodate C.V.'s disability. Because they failed to request an accommodation or show that the need for an accommodation was obvious, this claim fails.

ADA regulations require public entities to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7). As a result, we require public entities to provide reasonable accommodations to disabled persons. *Robertson v. Las Animas Cty. Sheriff's Dep't*, 500 F.3d 1185, 1195 (10th Cir. 2007).

A public entity must provide a reasonable accommodation under the ADA when it knows that the individual is disabled and "requires an accommodation of some kind to participate in or receive the benefits of its services." *Id.* at 1197. "[A] public entity is on notice that an individual needs an accommodation when it knows that an individual

- 17 -

requires one, either because that need is obvious or because the individual requests an accommodation." *Id.* at 1197-98.

Appellants do not contend they requested an accommodation for C.V. They assert the need for an accommodation was obvious because C.V.'s BIP did not include a restraint strategy. Appellants do not explain why this makes the need for an accommodation obvious. In any event, Officer Sanchez received permission from M.Q. to restrain C.V. without M.Q.'s mentioning particular limits on the form of restraint.

We said in *Bernalillo County* that an ADA plaintiff must show an obvious need for an accommodation. 806 F.3d at 1261; *see also Robertson*, 500 F.3d at 119. Appellants have not done so. Indeed, the accommodations Appellants asserted should have been employed were used and unsuccessful. They urged that removing the rubber band would have de-escalated the situation, but Officer Sanchez stepped on the rubber band, and this did not placate C.V. Appellants argued Ms. Martinez should have intervened, but Ms. Martinez tried to stabilize C.V. all morning to no avail. Under these circumstances, Appellants have not shown it was obvious to APS what other accommodations may have been needed.

Appellants also seem to assert that APS's failure to train its officers was a failure to accommodate C.V.'s disability, but they fail to explain or support how such training amounts to a reasonable accommodation under ADA law.[8] Nor do they show that

---

[8] Commenting on whether the ADA can support a claim for failure to train, the Fourth Circuit said, "While plaintiff attempts to pose training in dealing with those with mental health problems as an 'accommodation,' it is well-settled that the failure to train

Continued . . .

training was requested, that it was obvious to APS that training was needed, or what this training would entail. *See Sperry*, 592 F. App'x at 698; *Bernalillo County*, 806 F.3d at 1261; *Robertson*, 500 F.3d at 1197.

APS is therefore entitled to summary judgment on Appellants' reasonable accommodation claim.

## III. **CONCLUSION**

For the foregoing reasons, we affirm.

---

must have caused some violation of law for an action against a municipality to lie." *Waller ex rel. Estate of Hunt v. Danville, Va.*, 556 F.3d 171, 177 n.3 (4th Cir. 2009) (citing *City of Canton*, 489 U.S. at 388).