**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 26, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

CAROLYN HANS,

     Plaintiff - Appellant,

v.

BOARD OF SHAWNEE COUNTY
COMMISSIONERS; HERMAN T.
JONES,

     Defendants - Appellees.

No. 18-3096
(D.C. No. 5:16-CV-04117-DDC)
(D. Kan.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BRISCOE**, **LUCERO**, and **PHILLIPS**, Circuit Judges.
_____

Carolyn Hans appeals the district court's grant of summary judgment in favor

of defendants. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

**I**

The parties are familiar with the facts, which we do not need to describe in

detail. Briefly, Hans, who is deaf, was arrested by Shawnee County Sheriff's Office

Deputy Justin Dobler and Corporal Jace Beightel following a domestic dispute. She

sued the Board of County Commissioners of Shawnee County and Herman Jones,

_____

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Shawnee County Sheriff, in his official capacity. Hans brought claims under: (1) 42 U.S.C. § 1983; (2) Title II of the Americans with Disabilities Act ("ADA"); and (3) Kansas tort law. The district court granted summary judgment in favor of defendants on all claims. Hans appealed.

## II

We review the district court's grant of summary judgment de novo. Water Pik, Inc. v. Med-Systems, Inc., 726 F.3d 1136, 1143 (10th Cir. 2013). We view the facts in the light most favorable to Hans, the non-moving party, and draw all reasonable inferences in her favor. Talavera ex rel. Gonzalez v. Wiley, 725 F.3d 1262, 1267 (10th Cir. 2013).

## A

Hans alleges that defendants violated her Fourth Amendment rights when their employees arrested her without probable cause. To prevail on this claim, Hans must demonstrate, inter alia, that there is a dispute of material fact as to whether the officers had probable cause to arrest her. Cottrell v. Kaysville City, 994 F.2d 730, 733 (10th Cir. 1993) ("A Plaintiff may recover damages under § 1983 for wrongful arrest if she shows she was arrested without probable cause."). We review whether there was probable cause under an objective standard:

> Probable cause exists when the facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed and that the person . . . was involved in the crime.

2

Patel v. Hall, 849 F.3d 970, 981 (10th Cir. 2017) (quotation omitted). The offense in question is Kansas domestic battery, which requires "[k]nowingly causing physical contact with a family or household member . . . in a rude, insulting or angry manner." Kan. Stat. § 21-5414(a)(2) (2015).

It is undisputed that Hans admitted to the arresting officers that she made physical contact with her husband. Having reviewed the entire record, including a body camera video of Hans' interactions with law enforcement, we are satisfied that reasonably cautious officers would have concluded the contact occurred in an angry manner. Although Hans characterizes the physical contact as minor, the statements made to police by Hans' husband and her own reenactment of the contact provided probable cause for her arrest. Accordingly, defendants are entitled to summary judgment on Hans' § 1983 claim.

**B**

Hans seeks compensatory damages under Title II of the ADA, alleging defendants failed to accommodate her disability. We have previously held that "[t]o recover compensatory damages under § 504 [of the Rehabilitation Act], a plaintiff must establish that the agency's discrimination was intentional." Barber ex rel. Barber v. Colo. Dep't of Revenue, 562 F.3d 1222, 1228 (10th Cir. 2009) (citation omitted). And we "look to decisions construing the Rehabilitation Act to assist us in interpreting analogous provisions of the ADA." J.V. v. Albuquerque Pub. Sch., 813 F.3d 1289, 1298 n.6 (10th Cir. 2016) (quotation omitted).

3

Further, several of our sibling circuits have directly held that a plaintiff cannot recover compensatory damages under Title II of the ADA without establishing intentional discrimination.  See McCullum v. Orlando Reg'l Healthcare Sys., Inc., 768 F.3d 1135, 1146-47 (11th Cir. 2014) ("To prevail on a claim for compensatory damages under either the [Rehabilitation Act] or the ADA, a plaintiff must show that a defendant violated his rights under the statutes and did so with discriminatory intent."); Nieves-Marquez v. Puerto Rico, 353 F.3d 108, 126 (1st Cir. 2003); Delano-Pyle v. Victoria Cty., 302 F.3d 567, 574 (5th Cir. 2002); Duvall v. Cty. of Kitsap, 260 F.3d 1124, 1138 (9th Cir. 2001).  We agree.  Title II of the ADA provides for remedies available under the Rehabilitation Act, 42 U.S.C. § 12133, which in turn provides for remedies available under Title VI of the Civil Rights Act of 1964, 29 U.S.C. § 794a(a)(2).  And the Supreme Court has held that plaintiffs cannot "recover compensatory damages under Title VI except for intentional discrimination." Alexander v. Sandoval, 532 U.S. 275, 283 (2001).[1]

Hans needs to show on the merits that the alleged failure to accommodate was intentional in order to recover compensatory damages.  The district court concluded that Hans waived the opportunity to assert intentional discrimination because she did not include such a theory in the Pretrial Order.  See Tyler v. City of Manhattan, 118

---

[1] Hans argues there is a circuit split on this issue, citing to cases discussing the ADA in the context of claims for equitable relief.  See, e.g., Helen L. v. DiDario, 46 F.3d 325, 328 (3rd Cir. 1995).  She does not cite any cases holding that compensatory damages are available absent intentional discrimination.

F.3d 1400, 1404 (10th Cir. 1997) (affirming district court order striking claim for compensatory damages because Pretrial Order did not allege intentional discrimination).  On appeal, Hans fails to address this ruling.  See Tran v. Trs. of State Colls. in Colo., 355 F.3d 1263, 1266 (10th Cir. 2004) ("Issues not raised in the opening brief are deemed abandoned or waived." (quotation omitted)).  Because Hans does not challenge the district court's basis for rejecting her entitlement to compensatory damages under Title II, we do not disturb that ruling.[2]

---

[2] The dissent asserts that Hans adequately addressed this preservation argument in her opening brief.  We disagree.  She discussed Tyler in the context of whether plaintiffs are required to show intentional discrimination as part of their reasonable accommodation claims, but did not explain why the district court's separate preservation ruling was incorrect.  Opening Br. 31-32.

But even assuming Hans did not need to plead intentional discrimination in the pretrial order, we would still affirm.  We agree with the dissent that "intentional discrimination can be inferred from a defendant's deliberate indifference to the strong likelihood that pursuit of its questioned policies will likely result in a violation of federally protected rights."  Barber, 562 F.3d at 1228 (quotation omitted) (discussing Rehabilitation Act).  But "[t]he failure to act must be more than negligent and involve an element of deliberateness."  Albuquerque Pub. Sch., 813 F.3d at 1298 (quotations omitted).  And the district court ruled (in the alternative) that Hans has not created a material dispute as to deliberate indifference.  The dissent contends that deputies may have been deliberately indifferent to a strong likelihood of ineffective communication.  See 28 C.F.R. § 35.160(a)(1) (public entities must "take appropriate steps to ensure that communications with applicants, participants, members of the public, and companions with disabilities are as effective as communications with others").  However, our review of the summary judgment record shows that the deputies sought to communicate effectively with Hans and were at worst negligent rather than deliberately indifferent.  See Bircoll v. Miami-Dade Cty., 480 F.3d 1072, 1087 (11th Cir. 2007) ("In many circumstances, oral communication plus gestures and visual aids or note writing will achieve effective communication.").

## C

Hans alleges three violations of Kansas tort law:  (1) false arrest; (2) negligent training and supervision; and (3) intentional infliction of emotional distress.

Under Kansas law, a false arrest claim requires the restraint of an individual without legal excuse.  See Mendoza v. Reno Cty., 681 P.2d 676, 678 (Kan. 1984).  If the undisputed facts show that officers had probable cause to arrest plaintiff, she cannot prevail on a false arrest claim.  Id.  Given our previous determination that the officers had probable cause, defendants are entitled to summary judgment on this claim.

Defendants are also entitled to summary judgment on Hans' negligent training and supervision claim because plaintiff has not "establish[ed] facts showing that more or better training would have prevented the harm."  Estate of Belden v. Brown Cty., 261 P.3d 943, 968 (Kan. 2011).  Hans has not explained what additional training should have been provided or how such additional training would have prevented the harm.  Similarly, Hans has not adduced facts that would allow a reasonable jury to find defendants engaged in negligent supervision through "inadequate oversight and review of an employee in the performance of [the employee's] job duties or failing to control an employee with propensities that might pose a danger."  Id.

As to Hans' intentional infliction of emotional distress claim, the district court concluded that Hans' summary judgment response failed to identify admissible evidence sufficient to meet the elements of the tort.  On appeal, Hans merely states,

6

without citations to the record or relevant legal authority, that the same conduct giving rise to her other causes of action also established liability for intentional infliction of emotional distress. An argument advanced by "mere conclusory allegations with no citations to the record or any legal authority for support" is insufficient to preserve appellate review. Garrett v. Selby Connor Maddux & Janer, 425 F.3d 836, 841 (10th Cir. 2005).

## III

For the foregoing reasons, the district court's grant of summary judgment in favor of defendants is **AFFIRMED.**

Entered for the Court


Carlos F. Lucero
Circuit Judge

7

No. 18-3096, *Hans v. Board of Shawnee County Commissioners, et al.*

**PHILLIPS, J**., concurring in part and dissenting in part.

Carolyn Hans sued the Board of County Commissioners of Shawnee County and the Shawnee County Sheriff, asserting claims for relief under 42 U.S.C. § 1983, Title II of the Americans with Disabilities Act (ADA), and Kansas law. I join Part II.A of the majority opinion affirming summary judgment on her wrongful-arrest claims. But I dissent from Part II.B affirming summary judgment on her ADA claims. Because the underlying factual allegations bear on both claims, I briefly summarize them below.

## BACKGROUND

Carolyn Hans lives in Topeka, Kansas. She was born deaf to deaf parents and primarily communicates by American Sign Language (ASL). Carolyn can lip read just a "tiny, little bit," about "one or two words at a time." Hans's App. vol. 3 at 455. When she communicates with non-deaf people, she usually uses gestures or writes notes.

On the evening of April 3, 2015, Carolyn dialed 911 to report a domestic dispute with her husband, Raymond Hans. The dispatcher spoke with Raymond and sent Deputy Justin Dobler and Corporal Jace Beightel of the Shawnee County Sheriff's Office to the Hans home. Corporal Beightel (but not Deputy Dobler) was wearing a body camera, and the video captures much of the ensuing encounter. The deputies knew that Carolyn was deaf, so they spoke loudly and slowly to her. Carolyn generally understood the deputies' questions, but the deputies sometimes had difficulty understanding her.

After about ten minutes of interviewing the couple, the deputies had learned (1) that Carolyn wanted to drive away from the house after an argument with Raymond;

(2) that Raymond had begun draining the air from Carolyn's car tire to stop her from leaving; and (3) that Carolyn had pushed Raymond away from the tire so he could not flatten it. In addition, the deputies learned from Raymond that Carolyn had "stomped" on his hand, Defs.' Ex. 11 at 01:38, 05:08, but later heard him retract that allegation, admitting that Carolyn's poor equilibrium had caused her to accidentally step on his hand while pushing him, Defs.' Ex. 12 at 02:15. Deputy Dobler told Raymond that Carolyn was "protecting her property," and that "[i]f you came up to my car and I saw you messing with it, I'd push you away from it too." Defs.' Ex. 11 at 05:14, 05:38. Deputy Dobler then asked, "So what do we need to do to resolve this? She wants her keys, so she can drive [and] let stuff cool off." *Id.* at 05:49. Raymond responded, "That would be wise." *Id*. The deputies decided that because Carolyn had not intentionally stepped on Raymond's hand, no battery had occurred. Defs.' Ex. 12 at 04:07.

Carolyn tried to communicate several times that she wanted to retrieve her suitcase from her bedroom. The deputies could not understand her, so they asked Raymond for help. Raymond listened to her and told them that she needed to go upstairs to get a suitcase packed. As she left the house with the packed suitcase, intending to stay at her cousin's house, Corporal Beightel confronted her and asked, "Do you understand you were this close [gesturing with his fingers] to going to jail?" Defs.' Ex. 13 at 04:50. Carolyn became upset, protesting with further details about the domestic encounter.

She walked to the driveway, picked up a dog biscuit off the concrete, and explained to Corporal Beightel (with words and gestures) that after she pushed Raymond from the tire, Raymond had thrown the dog biscuit at her, hitting her in the eye. Corporal

2

Beightel went back inside the house and asked Raymond whether he had thrown a dog biscuit at Carolyn. Raymond denied it, asking, "where would I get a dog treat?" Defs.' Ex. 13 at 07:20. Corporal Beightel responded, "The dog treat is out there!" *Id*. Raymond replied, "Oh, when she came home, she carries them in the car. Usually, I'll open the garage, the dogs will come out, and we give them a treat. With all of the arguing, it was probably one of the dogs [inaudible]. I didn't throw nothing at her, honest to God." *Id.* at 07:32. At that point, Corporal Beightel said, "Ok, she's going to jail. . . . She told us you threw something that hit her in the eye. . . . What she did, after she had been explained about going to jail, was a different description of what she said the first time. So, she's going to jail." *Id.* at 07:52.[1] The officers offered Raymond the opportunity to provide a formal written statement, which he declined.

Despite having struggled to understand what Carolyn was trying to communicate, the deputies never called an ASL interpreter or gave Carolyn a chance to write down her version of events that supposedly were a change of story. Deputy Dobler had initially allowed her to write down what happened in his pocket notebook, but he had put the notebook away after about five to ten minutes, because he "felt it wasn't necessary" and believed they "were able to communicate very effectively" without the notebook. Hans's App. vol. 1 at 172. In addition, despite a county policy advising that "where possible a

---

[1] As Carolyn explained the dog-biscuit incident, she made a kicking motion. *See* Defs.' Ex. at 05:16, 06:32. The defendants argue that the deputies arrested her because they believed that she had kicked Raymond. But Corporal Beightel—the officer who made the decision to arrest Carolyn—testified that he did not recall having seen Carolyn make a kicking motion. Defs.' Ex. 13 at 07:52; Hans's App. vol. 3 at 52.

written statement should be obtained from any suspect," *see id.* vol. 2 at 356, the deputies did not invite Carolyn to provide a formal written statement, as they had done for Raymond. Deputy Dobler testified that a written statement from Carolyn was unnecessary, because he had already decided that he had probable cause to arrest her and that "it wouldn't have been practical from a safety point of view." *Id.* vol. 3 at 501. But he also testified that Carolyn posed no safety threat. *Id.* at 502, 505 (answering "no" to the question "[a]t any time did you fear for your safety as it related to Ms. Hans?" and to the question "[w]as there ever any time during that interaction that you felt like life or [] safety w[ere] really on the line?").

Ultimately, the deputies arrested and jailed Carolyn because they believed she had changed her story about something (though it's not clear what). During her booking into the county jail, Hans was not provided an ASL interpreter. One of the booking officers testified that he remembered allowing Hans to write notes, while another had no recollection of the booking. For her part, Hans testified that the booking officers did not offer her the opportunity to write down her answers to the questions. The officers placed Hans on suicide watch, purportedly because she had answered "a little bit" to the question "are you feeling hopeless or helpless?" *Id.* vol. 1 at 131–36. Hans denies having given such an answer. During her jailing, Carolyn was strip searched, and, despite her requests to use a toilet, told to urinate into a grate on the floor. Carolyn was later released, and the district attorney declined to file charges. Carolyn then brought this suit.[2] The

---

[2] Hans asserted ADA claims based on both her arrest and her jailing.

district court granted summary judgment for the defendants on all Hans's claims, and Hans has appealed.

## DISCUSSION

### I. Wrongful-Arrest Claims

I agree with the majority that Hans's wrongful-arrest claims fail as a matter of law, because the deputies had an objectively reasonable basis to believe that Hans had committed Kansas domestic battery—that is, she had "knowingly caus[ed] physical contact with" a family member in a "rude, insulting or angry manner." Kan. Stat. § 21-5414(a)(2) (2015). Hans admits that she pushed her husband, so even if the deputies had called an ASL interpreter, based on Carolyn's later account of events, the deputies would still have had a reasonable, objective basis supporting probable cause that Hans had committed Kansas domestic battery.[3] *Cf. Heien v. North Carolina*, 135 S. Ct. 530, 536 (2014) (holding that "reasonable suspicion can rest on a mistaken understanding of the scope of a legal prohibition").

But for the many reasons spelled out below, I would reverse the district court's ruling on Hans's ADA Title II reasonable-accommodation claims.

---

[3] I do wonder whether Carolyn's pushing Raymond away from the tire he was trying to flatten to keep her from escaping the domestic dispute, even if done while angry, is necessarily contact "done in a rude, insulting or angry manner." *See* Kan. Stat. § 21-5414(a)(2) (2015). But the parties didn't brief this issue. Instead, Hans argues that she had a right to defend her property under Kansas law. She is correct that Kansas police officers must consider whether someone is defending her property when making probable-cause determinations, *see* Kan. Stat. § 21-5231(a), but Carolyn's husband apparently co-owned the car, *see id.* at § 23-2801, and I cannot say that Kansas's defense-of-property statute extends as far as allowing force to prevent other co-owners from damaging property.

5

**II. Title II Claims**

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. From this language, our circuit has recognized three types of claims: "(1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation." *J.V. v. Albuquerque Pub. Sch.*, 813 F.3d 1289, 1295 (10th Cir. 2016). Each type of claim involves a different form of discrimination. The first type, disparate treatment, occurs when a defendant intentionally treats a disabled plaintiff less favorably than similarly situated non-disabled people. *Cinnamon Hills Youth Crisis Ctr., Inc. v. Saint George City*, 685 F.3d 917, 919 (10th Cir. 2012). The second type, disparate impact, "doesn't require proof of intentional discrimination," but rather occurs when a facially neutral policy disproportionately and negatively impacts the disabled (generally proved with statistical evidence). *Id.* at 922. The third type, failure to make a reasonable accommodation, occurs when the entity was on notice of the need for an accommodation, either because the plaintiff asked for one or the need was obvious, and the proposed accommodation was reasonable.[4] *Albuquerque Pub. Sch.*, 813 F.3d at 1299.

---

[4] Our court has held that Title II applies to arrests, *Gohier v. Enright*, 186 F.3d 1216, 1221 (10th Cir. 1999) ("[A] broad rule categorically excluding arrests from the scope of Title II . . . is not the law."), as well as "det[ention] in a county jail," *Robertson v. Las Animas Cty. Sheriff's Dep't,* 500 F.3d 1185, 1193 (10th Cir. 2007).

For her Title II claims, Hans pleaded two claims for failure to provide a reasonable accommodation. The district court elected not to "decide whether a genuine issue of material fact exists about [Hans's] ability to make a submissible case on these claims because [it] determine[d] that [Hans] cannot recover compensatory damages under Title II of the ADA without establishing intentional discrimination." *Hans v. Bd. of Shawnee Cty. Commissioners*, No. 16-4117-DDC, 2018 WL 1638503, at \*16 (D. Kan. Apr. 5, 2018). The majority does the same. Maj. Op. at 3–5. Because I would reverse the district court on its compensatory-damages ruling, I first explain why I would also conclude that Hans has raised a genuine issue of material fact on her reasonable-accommodation claim.

First, a jury could reasonably conclude that the need for an accommodation was obvious,[5] because the deputies knew Hans was deaf, and the video demonstrates that they had considerable difficulty trying to understand what she was saying. Second, Hans has identified two accommodations that a jury could find reasonable.[6] Hans claims (and the defendants do not dispute) that "an ASL interpreter was literally a phone call away." Appellant's Opening Br. at 36. In addition, she asserts that the deputies should have at

---

[5] Hans did not request an accommodation, so the question is whether the need for an accommodation was "obvious" to the defendants. *See Robertson*, 500 F.3d at 1197 ("When a disabled individual's need for an accommodation is obvious, the individual's failure to expressly 'request' one is not fatal to the ADA claim.").

[6] The regulations effectuating the ADA make clear that, where necessary and practicable, a public entity must provide hearing-impaired individuals with accommodations to ensure that it can communicate with them "as effective[ly]" as it does with others. 28 C.F.R. § 35.160(a)(1); *see also id.* at § 35.160(b), (c).

least given her "an opportunity to write out her account of the events" and "to participate in follow-up questions." *Id*. Indeed, Deputy Dobler allowed Hans to write down her story in his pocket notebook early in the interaction, but the deputies did not offer her the same accommodation later in the interaction, soon before arresting her. Accordingly, under our court's Title II caselaw, a reasonable factfinder could conclude that the defendants failed to reasonably accommodate Hans and thus "denied [her] the ability to participate in [emergency services] to the same extent as non-disabled individuals." *See Robertson*, 500 F.3d at 1199.

Having concluded that Hans has raised the needed genuine issues of material fact, I now turn back to the district court's rationale for granting summary judgment against her two reasonable-accommodation claims. The district court concluded that Hans "cannot recover compensatory damages under Title II of the ADA without establishing intentional discrimination." *Hans*, 2018 WL 1638503, at *16. It further concluded that Hans "waived the opportunity to assert intentional discrimination by omitting that claim from the Pretrial Order" and that, even absent waiver, Hans "failed to establish facts from which a reasonable jury could find that [the] defendants intentionally discriminated against her." *Id*. This analysis suffers fatal defects.

## A. Hans didn't need to plead "intentional discrimination" to be entitled to compensatory damages.

The majority opinion traces a chain from Title VI to the Rehabilitation Act to Title II, which it concludes requires pleading intentional discrimination (not a standalone

disparate-treatment claim)[7] as a prerequisite to compensatory damages. *Id.* at 4. In this

regard, the majority cites four circuits reaching that conclusion. *Id.* (citing *McCullum v.*

*Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1146-47 (11th Cir. 2014); *Nieves-*

*Marquez v. Puerto Rico*, 353 F.3d 108, 126 (1st Cir. 2003); *Delano-Pyle v. Victoria Cty.*,

302 F.3d 567, 574 (5th Cir. 2002); *Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1138 (9th Cir.

2001)). The majority concludes that these cases support its result—affirming dismissal of

Hans's Title II reasonable-accommodation claims on grounds that she has waived

compensatory damages (the only remedy she sought for this violation) by not pleading

intentional discrimination. *Id*. In my view, the majority errs in three ways.

    *First*, though the cited circuit cases and others on the same point[8] require Title II

plaintiffs to *prove* intentional discrimination to obtain compensatory damages, none of

these cases create any *pleading* requirements. Doing so now certainly takes us from the

mainstream.

    *Second*, the majority relies on *Tyler v. City of Manhattan*, 118 F.3d 1400, 1404

(10th Cir. 1997), as support for this newfound pleading requirement. In a parenthetical,

---

[7] Much confusion stems from the circuit courts indiscriminately using the term "intentional-discrimination." When used to describe the nature of a claim, courts often use the term interchangeably with "disparate treatment." *See*, *e.g.*, *Albuquerque Pub. Sch.*, 813 F.3d at 1295. But many courts also use the term to describe the level of culpability necessary to obtain compensatory damages, using "intentional discrimination" interchangeably with "deliberate indifference." *See* Part II.C *infra*.

[8] I have found four other circuits that have adopted the same rule. *See Lacy v. Cook Cty., Illinois*, 897 F.3d 847, 863 (7th Cir. 2018); *S.H. ex. rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 262 (3d Cir. 2013); *Meagley v. City of Little Rock*, 639 F.3d 384, 389 (8th Cir. 2011); *Powell v. Nat'l Bd. of Med. Examiners*, 364 F.3d 79, 89 (2d Cir. 2004).

the majority describes *Tyler* as a case "affirming [a] district court order striking [a] claim for compensatory damages because [the] Pretrial Order did not allege intentional discrimination." Maj. Op. at 4–5. From this the majority concludes that Hans is not entitled to compensatory damages under Title II. This misstates *Tyler*. In fact, *Tyler* analyzed compensatory damages as requiring the pleading of intentional discrimination simply because the parties had proceeded on that basis. 118 F.3d at 1403 ("Tyler *does not contest* the district court's ruling that intentional damages must be pleaded and proved in order to recover compensatory damages for mental and emotional distress under the ADA."). *Id.* at 1403–04 (emphasis added).

*Third*, the majority asserts that "Hans fails to address [*Tyler*'s] ruling" and therefore has "waived" the opportunity to "challenge the district court's basis for rejecting her entitlement to compensatory damages under Title II." Maj. Op. at 5. But Hans argued in her opening brief that *Tyler* "did not determine that a party could not recover damages if they did not plead intentional discrimination" and that it was "inappropriate [for the district court] to say that such is the holding of the *Tyler* decision." Appellant's Opening Br. at 32. Hans therefore did address *Tyler* and did challenge the district court's basis for concluding that *Tyler* created a new pleading requirement.

Whether Title II plaintiffs must plead or prove intentional discrimination to obtain compensatory damages are still open questions in our circuit. This is borne out by a case decided two years after *Tyler*. In *Davoll v. Webb*, our court concluded that the district court had not plainly erred by not instructing that compensatory damages for reasonable-accommodation claims require a showing of intentional discrimination under Title II. 194

10

F.3d 1116, 1141–42 (10th Cir. 1999). With our circuit's law being so undeveloped, I believe it unfair to dismiss Hans's Title II reasonable-accommodation claims for failure to do something we have not yet required—plead intentional discrimination to support compensatory damages for a reasonable-accommodation claim. *See Travelers Indem. Co. v. U.S., for Use of Constr. Specialties Co.*, 382 F.2d 103, 106 (10th Cir. 1967) ("The ends of justice are not served when forfeiture of just claims because of technical rules is allowed.").

**B. Hans has sufficiently pleaded intentional discrimination.**

Even if our circuit's caselaw did require Hans to "plead intentional discrimination," I would conclude that she has sufficiently done so. Hans can plead an ADA Title II reasonable-accommodation claim without pleading the words "intentional discrimination" as part of her reasonable-accommodation claim. Even if *Tyler* governed Hans's case, *Tyler* did not require explicitly pleading the words "intentional discrimination." Instead, it spoke of the pretrial order's "not describ[ing] acts of intentional wrongdoing," and lacking alleged "specific acts of intentional discrimination against [the plaintiff] in particular." 118 F.3d at 1403. Applying that same test here, and drawing all reasonable inferences in her favor, Hans's pleadings allege intentional wrongdoing. *See* Hans's App. vol. 1 at 17 ("Hans was denied full access to the County's services, strictly because of her status as a disabled person."); *id.* at 19 ("Hans was repeatedly and disturbingly denied full access to the County's services strictly because of her status as a disabled person."). *See also Nieves-Marquez v. Puerto Rico*, 353 F.3d 108,

11

126 (1st Cir. 2003) ("[W]ith all reasonable inferences drawn in its favor, [the complaint] alleges intentional discrimination.").[9]

### C. Hans has created a genuine issue of material fact as to intentional discrimination.

As noted, our circuit has yet to decide whether Title II plaintiffs asserting reasonable-accommodation claims must prove intentional discrimination to be entitled to compensatory damages. The district court relied on our Rehabilitation Act jurisprudence and caselaw from other circuits to "predict that our Circuit—if presented with the issue— would require [proving] intentional discrimination to recover compensatory damages under Title II of the ADA." *Hans*, 2018 WL 1638503, at *25. The district court further concluded that, on this record, no reasonable factfinder could decide that the defendants intentionally discriminated against Hans. *Id*. The majority seemingly agrees that Title II claimants must prove intentional discrimination to be entitled to compensatory damages. *See* Maj. Op. at 4. But when our court does ultimately decide this question in a published

---

[9] Even if the majority disagrees that Hans has pleaded intentional discrimination, our court allows parties to "constructively" amend their pleadings in summary-judgment briefing, so long as there is no prejudice to the opposing party. *See Ahmad v. Furlong*, 435 F.3d 1196, 1202 (10th Cir. 2006) ("[W]e have held that an affirmative defense was not waived for trial purposes when it had first been raised in a motion for summary judgment three months earlier."). Here, despite having a clear opportunity to move to dismiss Hans's complaint for failure to assert intentional discrimination, the defendants first raised the issue in their motion for summary judgment, long after the close of discovery and the filing of the pretrial order. In her response brief, Hans argued she did not need to prove deliberate indifference, and that, even if she did need to, the record sufficiently established deliberate indifference. Under *Ahmad*, this was sufficient to put the defendants on notice that Hans was pursuing an intentional-discrimination theory, and the defendants cannot credibly allege any prejudice from her failure to allege it in the pleadings. *See* 435 F.3d at 1201 ("[S]trict adherence to the pleading requirement is inappropriate when the purpose of the requirement has been otherwise fulfilled.").

opinion,[10] it should note that the circuits that have all reached the same result could be wrong.[11]

In any event, the court need not decide this question at this juncture, because even assuming that Hans must prove intentional discrimination to be entitled to compensatory damages, she has raised genuine issues of material fact about whether the defendants intentionally discriminated against her.

"[U]nlike some tests for intentional discrimination," our sister circuits use the "deliberate indifference" test, which "'does not require a showing of personal ill will or animosity toward the disabled person.'" *Meagley v. City of Little Rock*, 639 F.3d 384, 389 (8th Cir. 2011) (quoting *Barber ex rel. Barber v. Colorado Dep't of Revenue*, 562 F.3d 1222, 1228 (10th Cir. 2009)). Deliberate indifference under Title II requires showing that "the defendant knew that harm to a federally protected right was substantially likely and

---

[10] In *Tyler,* the United States, as amicus curiae, argued that plaintiffs need not prove intentional discrimination to obtain money damages under Title II, but we opted not to decide the issue because neither of the parties had raised it. 118 F.3d at 1403.

[11] *See Tyler*, 118 F.3d at 1409 (Jenkins, J., dissenting) (noting that requiring a showing of intentional discrimination to obtain money damages conflicts with the presumption set forth in *Franklin v. Gwinnett County Public Schools,* 503 U.S. 60, 72–73 (1992), that "when legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done") (internal quotations omitted); *Ferguson v. City of Phoenix*, 157 F.3d 668, 680 (9th Cir. 1998) (Tashima, J., dissenting) ("The majority's . . . holding[] that a Title II plaintiff must prove discriminatory intent, erects a near-insurmountable wall against the recovery of compensatory damages under the ADA."); *Davoll v. Webb*, 194 F.3d 1116, 1142 (10th Cir. 1999) (finding no plain error where district court allowed compensatory damages without a showing of intentional discrimination); *Levorsen v. Octapharma Plasma, Inc.*, 828 F.3d 1227, 1230 (10th Cir. 2016) ("[C]ourts must construe [the ADA] liberally to afford individuals with disabilities access to the same establishments available to those without disabilities.").

failed to act on that likelihood." *McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1147 (11th Cir. 2014); *cf. Havens v. Colorado Dep't of Corr.*, 897 F.3d 1250, 1264 (10th Cir. 2018).[12]

Here, the deputies did not call an ASL interpreter or allow Hans to write down her version of the events. And the defendants allege no exigencies precluding Hans's proposed accommodations. *See Bircoll v. Miami-Dade Cty.*, 480 F.3d 1072, 1086–87 (11th Cir. 2007) (concluding that it would be unreasonable for a police officer to call an ASL interpreter during a DUI stop because the officer "had to determine quickly, on the roadside at 3:00 a.m., whether [the plaintiff] was sober enough to drive his car further or whether to impound his car and arrest him"). In my view, a reasonable jury could conclude that the deputies knew that Hans's disability "required [them] to act differently than [they] would otherwise have acted, yet failed to adjust [their] behavior accordingly." *See Gray v. Cummings*, 917 F.3d 1, 18 (1st Cir. 2019); *see also Delano-Pyle v. Victoria Cty.*, 302 F.3d 567, 570–75 (5th Cir. 2002) (affirming jury's finding of deliberate indifference based on a police officer's failure to reasonably accommodate a hearing-impaired individual during a roadside sobriety test) ("Instead of [recognizing that the

---

[12] The district court concluded that the record did not establish deliberate indifference, in part, because it believed that Hans needed to identify a "specific policy" that violated Hans's rights. *Hans*, 2018 WL 1638503, at *20. But our "deliberate indifference" jurisprudence under the RA, a similar legislative regime, requires only that the plaintiff prove "(1) the defendant had knowledge that a harm to a federally protected right was substantially likely, and (2) a failure to act upon that likelihood." *Havens*, 897 F.3d at 1264 (internal alterations and quotation marks omitted); *see also Delano-Pyle v. Victoria Cty.*, 302 F.3d 567, 570–75 (5th Cir. 2002) (holding that "neither a policymaker, nor an official policy must be identified for claims asserted under the ADA" seeking compensatory damages).

plaintiff] was not understanding his verbal commands and trying a more effective form of communication, [the officer] only became annoyed and continued to further instruct [the plaintiff] through verbal communication.").

## CONCLUSION

For these reasons, I would reverse the district court's dismissal of Hans's two ADA Title II reasonable-accommodation claims.